UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE Y-mAbs THERAPEUTICS, INC. SECURITIES LITIGATION | Civil Action No.: 1:23-cv-00431-JMF |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

COOLEY LLP
Aric H. Wu
Sarah M. Topol
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
stopol@cooley.com

COOLEY LLP
Koji F. Fukumura (*pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121-1117
Tel: (858) 550-6000
kfukumura@cooley.com

July 11, 2023

*Attorneys for Defendants Y-mAbs Therapeutics,
Inc., Thomas Gad, Claus Juan Møller San
Pedro, and Vignesh Rajah*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

TABLE OF ABBREVIATIONS ................................................................................................. vii

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 2

    I.      Y-mAbs And The Individual Defendants ..................................................................... 2

    II.     The Development Of Omburtamab ............................................................................. 3

          A.      In 2001, Memorial Sloan Kettering Submits An Investigational New Drug Application To Initiate Clinical Development Of Omburtamab ........... 3

          B.      In 2004, Study 03-133 Commences .................................................................. 4

          C.      In 2015, Memorial Sloan Kettering Licenses The Commercial Development Rights For Omburtamab To Y-mAbs ....................................... 4

          D.      In 2016 and 2017, FDA Grants Omburtamab Rare Pediatric Disease, Orphan Drug, And Breakthrough Therapy Designations ............................... 4

          E.      In 2018, Y-mAbs Commences A Second Clinical Trial, Study 101, With Sites In The U.S., Europe, And Asia ...................................................... 5

    III.    In August 2020, Y-mAbs Commences A Rolling Submission Of A BLA ................. 5

    IV.    In October 2020, FDA Refuses To Accept Y-mAbs's BLA For Filing Because It Believed More Information To Support The Application Was Needed ...................... 5

    V.     In March 2022, Y-mAbs Resubmits Its BLA ............................................................. 6

    VI.    In May 2022, FDA Accepts Y-mAbs's BLA For Filing And Priority Review ........... 6

    VII.   In October 2022, ODAC Members Express Optimism For A Future "Pathway Forward," But Determine That More Data Is Needed ................................................ 6

    VIII.  In January 2023, This Lawsuit Is Filed ...................................................................... 8

LEGAL STANDARDS ............................................................................................................... 8

ARGUMENT ............................................................................................................................. 11

    I.      Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Plead An Actionable Misstatement Or Omission ..................................................................... 11

          A.      Statements Regarding FDA's Refusal To File Letter ................................... 11

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.      Statements Regarding The Company's Ability To Address The Issues Raised In FDA's Refusal To File Letter And Resubmit The BLA For Filing ................................................................................................. 13

C.      Statements Interpreting Clinical Trial Data ..................................................... 17

D.      Statements Regarding Prospects For FDA Approval Of Omburtamab ......... 18

II.    Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Plead Particularized Facts Giving Rise To A Strong Inference Of Fraudulent Intent ........ 20

III.   Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Adequately Plead Loss Causation ................................................................................. 24

IV.   Plaintiff's Section 20(a) Claim Against Møller and Gad Should Be Dismissed ....... 25

CONCLUSION ................................................................................................. 25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alkermes Pub. Ltd. Sec. Litig.*,
   523 F. Supp. 3d 283 (E.D.N.Y. 2021) ...............................................................17

*In re Aratana Therapuetics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............................................................20

*ATSI Commc'ns, Inc. v. Shaar Fund, Inc.*,
   493 F.3d 87 (2d Cir. 2007)..................................................................................2

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
   547 F. Supp. 3d 439 (S.D.N.Y. 2021)...............................................................24

*Branch v. TowerAir, Inc.*,
   1995 WL 649935 (S.D.N.Y. Nov. 3, 1995).........................................................9

*In re Bristol-Myers Squibb Co. CVR Secs. Litig.*,
   2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) ............................................. *passim*

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................9

*In re Carter-Wallace, Inc. Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000)...........................................................................14, 23

*Castillo v. Dean Witter Discover & Co.*,
   1998 WL 342050 (S.D.N.Y. June 25, 1998) ..................................................11, 24

*In re CRM Holdings, Ltd. Sec. Litig.*,
   2012 WL 1646888 (S.D.N.Y. May 10, 2012) ................................................21, 25

*Davidoff v. Farina*,
   2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)....................................................11

*In re Eaton Corp. Sec. Litig.*,
   2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017).....................................................14

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...............................................................................21

*In re EDAP TMS S.A. Sec. Litig.*,
   2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)........................................... *passim*

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Emps.' Ret. Sys. of the City of Baton Rouge and the Parish of E. Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) ..................................................................................................18

*Fort Worth Emps.' Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009)....................................................................................25

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs., Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)................................................................................2, 21

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014).....................................................................................................6

*In re Gildan Activewear, Inc. Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009)....................................................................................22

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)...............................................................15, 17, 18, 24

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d. 573 (S.D.N.Y. 2011)..............................................................................21, 22

*Gonzales v. Nat'l Westminster Bank PLC*,
847 F. Supp. 2d 567 (S.D.N.Y. 2012).....................................................................................2

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)....................................................................................18

*Hoey v. Insmed, Inc.*,
2018 WL 902266 (D.N.J. Feb. 15, 2018) .........................................................................13, 24

*Janus Cap. Grp. v. First Derivative Traders*,
564 U.S. 135 (2011)...............................................................................................................18

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)...................................................................................................21

*Kavanagh v. Zwilling*,
578 F. App'x 24 (2d Cir. 2014) ...............................................................................................9

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)...................................................................................................18

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012)....................................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)...................................................................................11

*Lewakowski v. Aquestive Therapeutics, Inc.*,
   2023 WL 2496504 (D.N.J. Mar. 14, 2023)............................................................20

*In re Longtop Fin. Techs., Ltd. Sec. Litig.*,
   939 F. Supp. 2d 360 (S.D.N.Y. 2013)......................................................................2

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021).................................................................8, 9

*In re MELA Sciences Inc., Sec. Litig.*,
   2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)......................................................17

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
   15 F. Supp. 3d 336 (S.D.N.Y. 2014)......................................................................25

*Okla. Firefighters Pension & Ret. Sys. v. Xerox*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018)....................................................................10

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...............................................................................................10

*In re Pfizer, Inc. Sec. Litig.*,
   538 F. Supp. 2d 621 (S.D.N.Y. 2008)......................................................................2

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)............................................................ *passim*

*Shapiro v. TG Therapeutics, Inc.*,
   2023 WL 405020 (S.D.N.Y. Jan. 25, 2023) .........................................................19

*Slayton v. American Express Co.*,
   604 F.3d 758 (2d Cir. 2010)...................................................................................11

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012).....................................................................18

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014).....................................................................25

*In re Take–Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)..................................................................................... *passim*

*Tongue v. Sanofi*,
　816 F.3d 199 (2d Cir. 2016)...................................................................................9, 10

*Venkataraman v. Kandi Techs. Grp., Inc.*,
　2021 WL 2952260 (S.D.N.Y. Oct. 25, 2021) .......................................................21

**Statutes, Regulations & Rules**

15 U.S.C.
　§ 78j(b)...................................................................................................... *passim*
　§ 78t(a) ...............................................................................................1, 8, 25
　§ 78u-4(b)(1)(B).......................................................................................................9
　§ 78u-5(c) ...............................................................................................................10

17 C.F.R. § 240.10b-5(b) ....................................................................................................9

21 C.F.R.
　§ 314.126(b)(2)(v)....................................................................................................4
　§ 601.2(a) .......................................................................................................6, 14, 15

Fed. R. Civ. P. 9(b) ...............................................................................................................9

Fed. R. Civ. P. 12(b)(6)........................................................................................................2

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **AC** | Plaintiff's Amended Complaint (Dkt. 38) |
| **BLA** | Biologics License Application |
| **CGCCR** | Central German Childhood Cancer Registry |
| **CNS** | Central nervous system |
| **Company or Y-mAbs** | Y-mAbs Therapeutics, Inc. |
| **CRL** | Complete Response Letter |
| **Defendants** | Y-mAbs Therapeutics, Inc., Thomas Gad, Claus Juan Møller San Pedro, and Vignesh Rajah |
| **Ex. __** | Exhibit to the Declaration of Sarah M. Topol, dated July 11, 2023 |
| **Exchange Act** | Securities Exchange Act of 1934, as amended |
| **FDA** | U.S. Food and Drug Administration |
| **IND Application** | Investigational New Drug Application |
| **Individual Defendants** | Y-mAbs Therapeutics, Inc. |
| **LM** | Leptomeninges |
| **MSK** | Memorial Sloan Kettering Cancer Center |
| **ODAC** | Oncologic Drugs Advisory Committee |
| **Omburtamab** | $^{131}$I-omburtamab |
| **RTF Letter** | Refusal to File Letter |
| **Plaintiff** | Lead Plaintiff Omar Miramontes |
| **PDUFA** | Prescription Drug User Fee Act of 1992, as amended |
| **PSLRA** | Private Securities Litigation Reform Act of 1995, as amended |
| **SEC** | U.S. Securities and Exchange Commission |
| **Section 10(b)** | 15 U.S.C. § 78j(b) |
| **Section 20(a)** | 15 U.S.C. § 78t(a) |
| **Study 03-133** | First clinical trial of $^{131}$I-omburtamab |
| **Study 101** | Second clinical trial of $^{131}$I-omburtamab |
| **Topol Declaration** | Declaration of Sarah M. Topol, dated July 11, 2023 |

## INTRODUCTION

Y-mAbs Therapeutics, Inc. develops antibody-based products for the treatment of rare forms of pediatric cancer.  One of Y-mAbs's drug product candidates, $^{131}$I-omburtamab ("omburtamab"), was originally developed by doctors at Memorial Sloan Kettering, who, in July 2004, commenced a clinical trial of omburtamab, Study 03-133.  In 2017, the U.S. Food and Drug Administration granted omburtamab Breakthrough Therapy designation, reflecting that preliminary clinical evidence showed that omburtamab may demonstrate substantial improvement over available therapies.  In 2018, Y-mAbs initiated a second clinical trial, Study 101, with sites in the U.S., Europe, and Asia.

In August 2020, Y-mAbs submitted a Biologics License Application seeking FDA approval for omburtamab, but, in October 2020, FDA issued a Refusal To File letter.  FDA declined to accept Y-mAbs's BLA for filing because it believed that the mathematical analysis comparing Study 03-133 results to a historical control needed adjustment and that more data was needed to demonstrate that omburtamab was having an antitumor effect.

In March 2022, Y-mAbs resubmitted its BLA, ¶ 142, but in October 2022, the Oncologic Drugs Advisory Committee, an advisory committee to FDA, while expressing hope for a "pathway forward," determined that more data was needed.  On December 1, 2022, Y-mAbs announced that FDA denied approval.

This lawsuit was filed in January 2023.  In his Amended Complaint, Plaintiff contends that investors were misled into believing that FDA would agree with Y-mAbs's analyses and interpretations of clinical trial data and approve omburtamab, and asserts claims for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

Although Plaintiff bears the burden of pleading particularized facts giving rise to a "strong inference" of fraud that is "cogent and at least as compelling as any opposing inference of

1

nonfraudulent intent," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007), Plaintiff has advanced a theory of fraud that makes little sense.  Plaintiff essentially claims that, even before FDA refused to file Y-mAbs's initial BLA in October 2020, Y-mAbs knew from FDA that the clinical trial data from Study 03-133 and Study 101 was inadequate and would never be sufficient.  ¶¶ 79-81, 83-88, 103.  But what Plaintiff conspicuously omits from the AC is that, in May 2022, FDA accepted Y-mAbs's resubmitted BLA for filing, granted it priority review, and scheduled an ODAC meeting to discuss the BLA.  Ex. 10 (May 31, 2022 press release).

Plaintiff does not, and cannot, explain why FDA would have bothered to accept the resubmitted BLA for filing, grant it priority review, and convene an ODAC meeting if, as Plaintiff claims, FDA had already concluded nearly two years earlier that the clinical trial data was insufficient and approval of omburtamab would not be granted.  This is a glaring hole in Plaintiff's story and undermines any "cogent" inference of fraud.

As explained herein, Plaintiff has failed to adequately plead virtually every element of a securities fraud claim.  The Amended Complaint should be dismissed with prejudice.

**FACTUAL BACKGROUND**

**I.    Y-mAbs And The Individual Defendants**

Founded in 2015, Y-mAbs is a biopharmaceutical company focused on the development of antibody-based therapeutic products for the treatment of rare forms of pediatric cancer.  ¶ 25.[1]
Defendant Thomas Gad founded Y-mAbs after his daughter was diagnosed with cancer before she

---

[1] Cites to "¶ _" refer to paragraphs of the Amended Complaint (Dkt. 28), and freestanding cites to "Ex. _" refer to exhibits of the Declaration of Sarah M. Topol, dated July 11, 2023, which are documents that may be properly considered on Rule 12(b)(6) motion to dismiss—*i.e.*, "documents incorporated into the complaint by reference," *ATSI Commc'ns, Inc. v. Shaar Fund, Inc.*, 493 F.3d 87, 98 (2d Cir. 2007), as well as "matters of which a Court may take judicial notice," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008), including "public documents required to be filed with the SEC," *In re Longtop Fin. Techs., Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013); "news articles" and "public documents," *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012), and "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs., Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018).  Page numbers refer to the native pagination of each cited exhibit.

turned two; he is currently the Company's President and interim CEO.  ¶ 26; Ex. 15 at 48:8-49:7.

Defendant Claus Juan Møller San Pedro ("Møller") was previously the CEO.  ¶ 27.  Defendant

Vignesh Rajah has been Y-mAbs's Chief Medical Officer since June 2020.  ¶ 28.

In November 2020, FDA approved Y-mAbs's drug product, DANYELZA®, for use in the

treatment of children with a relapse of neuroblastoma in their bone or bone marrow.  Ex. 8 at 5.

Y-mAbs also has a number of other drug product candidates in development.  *Id.* at 9.

## II.    The Development Of Omburtamab

One of Y-mAbs's drug product candidates, omburtamab, is directed to treating children

with a relapse of neuroblastoma in their central nervous systems ("CNS") or leptomeninges

("LM"), the thin layer of tissue that covers the brain and spinal cord.  Ex. 1 at 24.  While

neuroblastoma accounts for 7-10% of childhood cancers, only a very small subset of those

diagnosed ultimately suffer from a CNS/LM relapse.  AC Ex. A at 11; ¶ 33.

In the U.S., it is estimated that between nine and 18 children each year are diagnosed with

CNS/LM relapse.  Ex. 15 at 54:8-12.  There are currently no accepted clinical guidelines for the

treatment of these children.  ¶ 35; AC Ex. A at 11.  The average age of a child diagnosed with

neuroblastoma is one to two years, and the median survival of those diagnosed with CNS/LM

relapse is less than one year.  Ex. 15 at 53:12-55:3; AC Ex. A at 11.  As discussed below,

omburtamab has been in development for more than 20 years.

### A.    In 2001, Memorial Sloan Kettering Submits An Investigational New Drug Application To Initiate Clinical Development Of Omburtamab

Omburtamab was originally developed by doctors at Memorial Sloan Kettering.  To target

cancerous cells surrounding the brain and spinal cord, omburtamab must be delivered via a device

surgically implanted into a child's brain in a hospital with sufficient pediatric neurosurgery

resources, like MSK.  AC Ex. A at 12.  In 2001, MSK submitted an Investigational New Drug application for omburtamab.  Ex. 15 at 49:10-12.

### B.      In 2004, Study 03-133 Commences

In July 2004, MSK commenced a clinical trial, Study 03-133, with omburtamab.  AC Ex. A at 25; Ex. 15 at 49:10-12.  Rather than compare against the outcomes for a placebo group, which would be neither practical nor ethical given the limited patient population and high mortality rate, Study 03-133 trial results have been compared against the outcomes for a historical group of patients drawn from the Central German Childhood Cancer Registry ("CGCCR"), a database kept by the Neuroblastoma Study Center in Cologne, Germany.  ¶ 42; Ex. 15 at 92:16-21.  This is consistent with Congress's authorization of the use of historical control groups for diseases with "high and predictable mortality."  21 C.F.R. § 314.126(b)(2)(v); *see also* Ex. 21 at 8 (noting that, where delivery of a placebo involves risk greater than a "minor increase over minimal risk," ethics may prevent use of a placebo arm).

### C.      In 2015, Memorial Sloan Kettering Licenses The Commercial Development Rights For Omburtamab To Y-mAbs

Among the patients enrolled in Study 03-133 was Mr. Gad's daughter.  Ex. 15 at 48:9-20.  In 2015, Mr. Gad founded Y-mAbs, and MSK licensed the commercial development rights for omburtamab to Y-mAbs.  Ex. 1 at 46-47.

### D.      In 2016 and 2017, FDA Grants Omburtamab Rare Pediatric Disease, Orphan Drug, And Breakthrough Therapy Designations

In 2016, FDA granted omburtamab Rare Pediatric Disease and Orphan Drug designations.  AC Ex. A at 20; C.F.R. § 314; Ex. 18.

In 2017, FDA granted omburtamab Breakthrough Therapy designation, reflecting that "preliminary clinical evidence indicate[d] that the drug may demonstrate substantial improvement

4

over available therapy on a clinically significant endpoint(s)."  Ex. 15 at 98:9-19; Ex. 22; AC Ex. A at 20.

### E.    In 2018, Y-mAbs Commences A Second Clinical Trial, Study 101, With Sites In The U.S., Europe, And Asia

In December 2018, Y-mAbs initiated a second clinical trial, Study 101, with eight sites in four countries in the U.S., Europe, and Asia.  Ex. 15 at 62:11-15; AC Ex. A at 24.  Study 101 was designed, among other things, to demonstrate comparability of results between study sites since the clinical development to this point had been solely at MSK.  Ex. 1 at 29.

### III.    In August 2020, Y-mAbs Commences A Rolling Submission Of A BLA

In August 2020, Y-mAbs commenced a rolling submission of a Biologics License Application for omburtamab.  AC Ex. A at 22.  FDA permits a rolling submission to "expedite the review of drugs to treat serious conditions and fill an unmet medical need."  Ex. 23 at 1.

### IV.    In October 2020, FDA Refuses To Accept Y-mAbs's BLA For Filing Because It Believed More Information To Support The Application Was Needed

On October 2, 2020, FDA issued a Refusal to File letter, indicating that the BLA was not sufficiently complete to be accepted for filing.  ¶ 90; Ex. 16 at 2, 4-5.  FDA identified two primary issues: (1) the mathematical analysis used to compare the results of Study 03-133 to the historical control needed to be adjusted; and (2) more data was needed to demonstrate that omburtamab was having an antitumor effect.  ¶ 90; AC Ex. A at 22.

On October 5, 2020, Y-mAbs issued a press release announcing its receipt of the RTF letter.  ¶ 91; Ex. 2.  On an analyst call the next day, Mr. Møller explained that FDA requested "a different type of statistical comparison between the data from Study 03-133 and the [CGCCR] study with more than 100 patients and the historical controls" and "tumor response data for patients from Study 101."  Ex. 3 at 7; ¶ 100.

**V.     In March 2022, Y-mAbs Resubmits Its BLA**

Following the receipt of the RTF letter, Y-mAbs worked on the additional information requested by FDA.  On March 31, 2022, Y-mAbs resubmitted the BLA.  ¶ 142.  In April 2022, with first quarter 2022 net revenues of $10.5 million from sales of DANYELZA®, Y-mAbs provided investors with full year 2022 revenue guidance of $45-50 million.  Ex. 9.  Y-mAbs's full year 2022 guidance specifically excluded any "potential omburtamab revenues."  *Id.*

**VI.    In May 2022, FDA Accepts Y-mAbs's BLA For Filing And Priority Review**

FDA could have again refused to accept Y-mAbs's BLA for filing.  Ex. 16; 21 C.F.R. § 601.2(a).  Instead, in May 2022, FDA accepted the BLA for filing and granted priority review, setting an action date of November 30, 2022 under the Prescription Drug User Fee Act,[2] and informed Y-mAbs that it planned to convene an advisory committee meeting in October 2022 to discuss the BLA.  Ex. 10.

**VII.   In October 2022, ODAC Members Express Optimism For A Future "Pathway Forward," But Determine That More Data Is Needed**

FDA requested that the Oncologic Drugs Advisory Committee, which includes 16 members, convene on October 28, 2022, ¶ 154; Ex. 15 at 2-11, to address the following issue: "whether the data provided by the applicant isolates the treatment effects of multimodality therapy for central nervous system/leptomeningeal metastases relapse of if additional data are needed."  Ex. 15 at 208:8-13.  ODAC is advisory; FDA retains the final decision on whether a drug product should be approved.  Ex. 20.

In advance of the October 28, 2022 meeting, ODAC members were provided a "FDA Briefing Document" containing "assessments and/or conclusions and recommendations written by

---

[2] A PDUFA action date is the "target date for approval" of an application that has been accepted for filing, but is "not a guarantee of approval."  *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 35 n.2 (1st Cir. 2014).

individual FDA reviewers" that "do not necessarily represent the final position of the individual reviewers" or "the Review Division or Office."  AC Ex. A at 1.  The FDA Briefing Document further cautioned that it "may not include all issues relevant to the final regulatory recommendation."  *Id.*  ODAC members were also provided a "Sponsor Briefing Document" prepared by Y-mAbs.  Ex. 14.

During the ODAC meeting, Y-mAbs presented its interpretation of the Study 03-133 results, which it believed showed omburtamab reduced the risk of death by 42%, and the Study 101 results, which it believed showed omburtamab reduced or kept stable 70% of patients' tumors.  Ex. 15 at 51:17-21, 67:2-5 (14 of 20 patients showed a response or remained stable).  In the FDA Briefing Document, the individual FDA reviewers explained their interpretation of the Study 03-133 results, which differed from Y-mAbs's interpretation because they excluded 12 patients from Study 03-133 and applied different mathematical analyses to compare the studied population to the historical control.  AC Ex. A at 31-38.  They also interpreted the Study 101 results as not sufficiently demonstrating that omburtamab had an effect on the tumors because the data was "limited" and "responses were not confirmed by subsequent imaging" for three of the seven patients reported as responders, which made attribution of improvement to omburtamab alone difficult.  *Id.* at 10, 39-40.

ODAC members expressed optimism for a future "pathway forward," Ex. 15 at 224:8-18, but determined that more data was needed to isolate the treatment effects of omburtamab, *id.* at 208:8-13; *see also id.* at 217:19-218:3 (providing a "suggestion for going forward"); *id.* at 218:18-219:20 (noting "desire from the panel to see more robust data" and "possible pathways forward in regards to what additional data could be helpful"); *id.* at 224:8-18 ("I would just say, in terms of

7

next steps, I hope and believe there may be a pathway forward."); *id.* at 227:14-17 ("I do also hope that there is a way forward for us to try to get more data to further investigate …").

On October 28, 2022, Y-mAbs issued a press release announcing that ODAC "voted 16 to 0 that the Company had not provided sufficient evidence to conclude that omburtamab improves overall survival." ¶ 164.

## VIII.    In January 2023, This Lawsuit Is Filed

On December 1, 2022, Y-mAbs announced that FDA had issued a Complete Response Letter, denying approval of the omburtamab BLA in its then-current form and recommending discussion of a trial design to sufficiently isolate the treatment effects of omburtamab.  Ex. 12.

On January 18, 2023, this lawsuit was filed.  In the Amended Complaint, Plaintiff purports to bring claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of a putative class comprised of all purchasers of Y-mAbs common stock between October 6, 2020 and October 28, 2022.  Relying almost entirely on the FDA Briefing Document submitted for the October 28, 2022 meeting of ODAC, and notwithstanding Y-mAbs's repeated cautionary statements to investors that FDA approval of omburtamab was uncertain, Plaintiff contends that Y-mAbs's statements relating to the omburtamab BLA for a nearly two-year period (October 5, 2020 to August 9, 2022) were false and misleading because they misled investors into believing that FDA would agree with Y-mAbs's analyses and interpretations of clinical trial data and approve the BLA.  ¶¶ 91-153.

## LEGAL STANDARDS

To state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a plaintiff must plead facts showing (i) a material misrepresentation or omission, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) reliance, (v) loss causation, and (vi) damages.  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 778 (S.D.N.Y. 2021).  The Court "must consider the complaint in its entirety, … documents incorporated into the

8

complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. A court need "not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences." *Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014). "The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).

*Particularity Requirements.* Plaintiff's Section 10(b) claim is subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Maloney*, 518 F. Supp. 3d at 777. Under Rule 9(b), which is "rigorously enforced," a plaintiff must "specify the time, place, speaker and content of the alleged misrepresentation." *Branch v. TowerAir, Inc.*, 1995 WL 649935, at *4 (S.D.N.Y. Nov. 3, 1995). Under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

*Pleading Requirements for Challenged Statements or Omissions of Material Fact.* A plaintiff must plead particularized facts showing that an alleged misstatement "was false *at the time it was made*." *In re Bristol-Myers Squibb Co. CVR Secs. Litig.*, 2023 WL 2308151, at *3 (S.D.N.Y. Mar. 1, 2023). There is no duty to disclose all material information, and an omission is actionable only if disclosure was necessary "to make … statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

*Pleading Requirements for Challenged Opinion Statements.* "In contrast to objective statements of material fact, subjective statements of opinion are generally not actionable as fraud." *In re Sanofi Sec. Litig.,* 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*,

816 F.3d 199 (2d Cir. 2016).  An opinion statement is only actionable if a plaintiff pleads facts

showing that the speaker (i) did not honestly believe the statement or supplied an untrue supporting

fact; or (ii) omitted information that made the opinion statement misleading to a reasonable

investor.  *Tongue*, 816 F.3d at 210.[3]

    ***PSLRA Safe Harbor for Forward-Looking Statements.***  Forward-looking statements are

protected by the PSLRA's "safe harbor," which provides that a defendant "shall not be liable" for

any forward-looking statement that is either (i) "identified as a forward-looking statement, and is

accompanied by meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the forward-looking statement;" (ii) "immaterial;"

or (iii) not "made with actual knowledge by [the speaker] that the statement was false or

misleading." 15 U.S.C. § 78u-5(c).  "Because the statute is written in the disjunctive, [forward-

looking] statements are protected by the safe harbor if they satisfy *any one* of these three

categories." *Okla. Firefighters Pension & Ret. Sys. v. Xerox*, 300 F. Supp. 3d 551, 567 (S.D.N.Y.

2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox*, 771 F. App'x 51 (2d Cir. 2019).

    ***Strong Inference of Scienter Requirement.***  "[A] complaint must, with respect to each

defendant and with respect to each act or omission alleged to [constitute securities fraud], state

with particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind." *Bristol-Myers*, 2023 WL 2308151, at *3 (cleaned up).  For statements of existing

fact, a strong inference of knowing falsity or recklessness is required; for forward-looking

---

[3] The Supreme Court has cautioned against an "overly expansive reading" of the omissions theory of liability. *Tongue*, 816 F.3d at 210.  Because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," an opinion statement is not actionable merely because "some fact cutting the other way" is not disclosed. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015).  Rather, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.  That is "no small task for an investor." *Id.*

statements, only a strong inference of knowing falsity will suffice. *See Slayton v. American Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). The "strong inference" must be "more than merely plausible or reasonable;" it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 314, 324.

***Loss Causation Pleading Requirement.*** "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (cleaned up). A plaintiff must plead facts showing the requisite causal link for *each* alleged misrepresentation. *See Castillo v. Dean Witter Discover & Co.*, 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998); *Davidoff v. Farina*, 2005 WL 2030501, at *15-16 (S.D.N.Y. Aug. 22, 2005) (analyzing loss causation allegations with respect to each of three alleged misstatements).

## ARGUMENT

As discussed below, the Amended Complaint fails to adequately plead virtually every element of a securities fraud claim.

## I.    Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Plead An Actionable Misstatement Or Omission

On October 2, 2020, FDA issued an RTF letter, indicating that Y-mAbs's initial BLA submission was not sufficient to be accepted for filing. ¶ 90. Plaintiff contends that Y-mAbs's statements relating to the BLA thereafter for a nearly two-year period (October 5, 2020 to August 9, 2022) were false and misleading. ¶¶ 91-153.

As discussed below, Plaintiff has failed to plead an actionable misstatement or omission.

### A.    Statements Regarding FDA's Refusal To File Letter

On October 5, 2020, Y-mAbs issued a press release announcing its receipt of FDA's RTF letter. ¶¶ 91-94, 102. Plaintiff criticizes Y-mAbs for stating that "[n]o additional non-clinical data

11

have been requested," ¶ 92, but the AC does not identify any non-clinical data requested in the RTF letter.  Nor does the AC plead any contemporaneous facts showing that Y-mAbs did not intend to "request a Type A meeting with the FDA as soon as possible." ¶ 94; *see also* ¶ 95 (similar statement on October 6).  Instead, the AC admits that a Type A meeting with FDA occurred less than a month later on November 3, 2020.  ¶ 106.

On October 6, 2020, Y-mAbs hosted a conference call.  ¶¶ 95-101.  Plaintiff challenges Møller's description of what FDA requested in the RTF letter, but the FDA Briefing Document attached to Plaintiff's AC directly refutes their claim.  *Compare* ¶ 100 (Møller statement that FDA requested a "different type of statistical comparison between the data from Study 03-133 and the [CGCCR] study with … the historical controls" and certain "tumor response data for patients from Study 101"), *with* AC Ex. A at 22 ("FDA issued a RTF letter stating that … data from Study 03-133 and the external control should be reanalyzed using a propensity score adjusted analysis … [and] direct evidence of the anti-tumor effect … is needed to provide supportive evidence.").

The AC is devoid of contemporaneous facts showing that, in October 2020, Møller was not "surprised" and "disappointed" by the RTF letter, ¶ 96, did not think that FDA "want[ed] to work with [the Company] on getting this successfully refiled and approved," Ex. 3 at 9; ¶ 98, did not honestly believe the RTF letter was a "minor setback" and "not a problem," ¶¶ 100-101, or was concerned FDA would find Y-mAbs's responses to the RTF letter requests insufficient, ¶ 100. Instead, the AC falsely attributes to the pre-RTF letter period FDA communications that did not occur before Y-mAbs's receipt of the RTF letter.  For example, Plaintiff claims that, between 2017 and 2020, FDA "repeatedly advised Y-mAbs of its concerns that … no patient in Study 101 demonstrated an unequivocal treatment response that could be definitively attributed to omburtamab." ¶ 103.  But no tumor response data from Study 101 was even included in the initial

BLA, Ex. 3 at 4, 7-8, and the FDA Briefing Document attached to the AC shows that this view of Study 101 was based on FDA's evaluation of the BLA resubmitted in March 2022.[4]  AC Ex. A at 10.  Defendants could not have known about or disclosed something that had not yet occurred.

To the extent Plaintiff contends that Y-mAbs should have disclosed what FDA conveyed in communications "throughout 2017 to 2020," ¶ 103, "the law with respect to this issue is clear: a biopharmaceutical corporation need not share a regulatory agency's response or criticism to a trial and its results if it does not constitute a final determination."  *Hoey v. Insmed, Inc.*, 2018 WL 902266, at *14 (D.N.J. Feb. 15, 2018).  None of the pre-RTF letter communications by FDA, ¶¶ 79-81, 83-88, constituted a final FDA determination.  "[I]nterim FDA feedback is not material because it does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications."  *Sanofi*, 87 F. Supp. 3d at 542; *see also id.* at 541 ("[C]ourts have rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA.").

### B.    Statements Regarding The Company's Ability To Address The Issues Raised In FDA's Refusal To File Letter And Resubmit The BLA For Filing

Plaintiff challenges opinion statements regarding Y-mAbs's ability to address the issues raised in the RTF letter, but the AC is devoid of contemporaneous facts showing that Defendants were not genuinely "confident" that Y-mAbs could address or "rectify" the issues raised in the

---

[4] The AC also falsely attributes the following to pre-RTF letter period FDA communications: "the receipt of so much intensive treatment prior to administration of omburtamab by patients in Study 03-133 'would likely make it difficult to determine if any effects on survival are due to omburtamab and not to those treatments'"; and "direct evidence of the anti-tumor effect of omburtamab … [is] needed to demonstrate efficacy."  ¶ 103; *compare with* Ex. 15 at 35:5-12 (observing, at October 2022 ODAC meeting regarding March 2022 BLA, that "the receipt of so much intensive treatment prior to administration of omburtamab … would likely make it difficult to determine if any effects on survival are due to omburtamab and not to those treatments"); AC Ex. A at 22 (noting that it was in the RTF letter that FDA informed Y-mAbs that "direct evidence of the anti-tumor effect … is needed.").

RTF letter, ¶¶ 93, 95, 97, 99, 107, 115;[5] did not, in May 2021, genuinely "hope to reach final agreement with the [FDA]" on historical control group data needed for the BLA, ¶ 120; did not genuinely believe in June or November 2021 that it had a "clearer path towards" resubmission of the BLA and was "aligned with the FDA on the next step towards the resubmission," ¶¶ 122, 127; did not genuinely believe in December 2021 that Y-mAbs had "put together a very strong package that should satisfy the concerns FDA raised" and "expect[ed] to get a green light" from FDA to resubmit the BLA,[6] ¶ 129; did not genuinely believe in February 2022 that it had "all the information" needed and had "confirmed [the] path towards a BLA resubmission," ¶¶ 133, 137-38; or, in April and May 2022, were not genuinely "excited" by the resubmission of the BLA or did not believe it was part of a "great start" to 2022.  ¶¶ 143, 148.  Companies "are not required to take a gloomy, fearful, or defeatist view of the future," and even "misguided optimism … does not support an inference of fraud."  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000) (cleaned up).

Here, Y-mAbs's optimism was not misguided.  In assessing whether to accept a BLA for filing, FDA looks for "filing issues," such as "complex significant deficiencies that preclude correction before filing."  Ex. 17 at 10.  Examples of such deficiencies include issues with "statistical analyses," "use of a trial design that is inappropriate," and "reliance solely on trials that fail to achieve statistical significance on the primary endpoint or endpoints."  *Id.* at 18, 20.  As it

---

[5]  In challenging Møller's November 2020 opinion statement that "it's pretty clear that on the Chemistry, Manufacturing, and Controls we have resolved all the issues [FDA] have requested," ¶ 107, Plaintiff misleadingly omits what Møller stated immediately thereafter: "There are still some issues we need additional clarification on in terms of level of response rates and number of patients [FDA] want to see response rates from.  And [FDA] and us are still discussing it."  Ex. 4 at 12; *see In re Eaton Corp. Sec. Litig.*, 2017 WL 4217146, at *2 n.1 (S.D.N.Y. Sept. 20, 2017) (where complaint "quotes only select portions of the statements made by the defendants," court is "entitled to consider the full text of those documents in ruling on the motion to dismiss") (cleaned up).

[6]  There is no requirement that a company obtain FDA's agreement to, or approval of, the contents of a drug product application before submitting the application.  *See* 21 C.F.R. § 601.2(a).  If the contents are incomplete or deficient, FDA will refuse to file the application, Ex. 17 at 10, 18-20, as it did with Y-mAbs's initial BLA. ¶ 90.

did with Y-mAbs's August 2020 BLA, FDA could have refused to file Y-mAbs's March 2022 BLA. Ex. 16; 21 C.F.R. § 601.2(a). Instead, in May 2022, FDA accepted Y-mAbs's resubmitted BLA for filing, a key event that Plaintiff conspicuously omits from the AC, and scheduled an October 2022 ODAC meeting to discuss the BLA. *Compare* ¶¶ 148-51 (skipping from May 10, 2022 to August 9, 2022), *with* Ex. 10 (May 31, 2022 press release announcing FDA's acceptance of BLA for filing). Plaintiff never explains why FDA would have bothered to accept the BLA for filing and convene an ODAC meeting if, as Plaintiff claims, FDA had already concluded that the clinical trial data was insufficient and approval of omburtamab would not be granted.

Statements regarding the timing for resubmission of the BLA are squarely protected by the PSLRA safe harbor for forward-looking statements. The AC does not plead contemporaneous facts showing that, in October or November 2020, Y-mAbs had actual knowledge it could not meet its "goal of resubmitting the BLA before the end of 2020" or "resubmit the omburtamab BLA late 2020 or in the beginning of 2021," ¶¶ 94-95, 99, 107, or that, in May 2021, it could not resubmit the BLA by "the third quarter of [2021]."[7] ¶ 120. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 585-86 (S.D.N.Y. 2016) (dismissing Section 10(b) claim based on forward-looking statement about likelihood of FDA approval where complaint failed to plead particularized facts giving rise to a strong inference of actual knowledge of facts contradicting statement).

In addition, the challenged statements were identified as forward-looking and accompanied by meaningful cautionary statements. *See Bristol-Myers*, 2023 WL 2308151 at *9 (dismissing claim where challenged forward-looking statements were accompanied by "meaningful cautionary language"). In its October 5, 2020 press release, for example, Y-mAbs warned that "forward

---

[7] Plaintiff also misguidedly challenges statements in November 2021 and February 2022 expressing Defendants' belief that the BLA could be resubmitted in the first quarter of 2022. ¶¶ 127, 133. As the AC itself admits, the BLA was resubmitted in in the first quarter of 2022. ¶ 142.

looking statements," including "statements about our business model and development and commercialization plans; clinical and pre-clinical studies and our research and development plans; regulatory, marketing, and reimbursement approvals," were subject to the risk factors in Y-mAbs's March 2020 Form 10-K.  Ex. 2; *see also* Ex. 4 at 4 (same warning in November 6, 2020 earnings call transcript).[8]  That Form 10-K identified a number of risks and uncertainties, including that:

> We have initiated … Study 101 and such studies form the primary basis for our submitted and planned BLAs, to establish comparability of study population and pharmacokinetics analysis with … Study 03-133 … and to satisfy the confirmatory study and post-marketing requirements by the FDA.  If the results of these studies fail to demonstrate comparability to the satisfaction of the FDA … this may lead to a delay in, or otherwise adversely affect such clinical trials, including the timing of submission of our BLA, or completing submission of our BLA … Further, our product candidates may not be approved even if they achieve their primary endpoints …. The FDA or non-U.S. regulatory authorities may disagree with our trial design and our interpretation of data from pre-clinical studies and clinical trials.

Ex. 1 at 72; *see also* Ex. 8 at 4, 26, 79-80 (similar risk factors in March 2021 Form 10-K incorporated by reference during May 7, 2021 earnings call, *see* Ex. 6 at 4).  These are "equally, if not more, cautionary than statements that other courts have found to be protected."  *Bristol-Myers*, 2023 WL 2308151, at *9 (discussing sufficiency of cautionary language, including that "achieving the Milestone Deadlines is dependent on 'uncertainties relating to . . . the content and timing of decisions made by the FDA.'").

Furthermore, statements of corporate optimism such as "we believe we now have a clearer path towards the resubmission," "the resubmission of the omburtamab BLA is progressing well," and "[t]he resubmission of omburtamab BLA is progressing as planned," ¶¶ 122, 127, 133, 137, constitute inactionable puffery and are immaterial as a matter of law.  *See, e.g.*, *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166 at *9-10 (S.D.N.Y. Sept. 14, 2015) (company's statements that

---

[8] *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 179 (S.D.N.Y. 2012), *aff'd*, 543 F. App'x 72 (2d Cir. 2013) ("cautionary information need not be in the same document that contains the forward-looking statement").

"the process was 'on track' and making continued 'progress," as well as "moving through the approval process in a timely manner," and that it was excited about "having 'a much clearer path toward FDA approval'" were inactionable puffery).

## C.    Statements Interpreting Clinical Trial Data

Plaintiffs also misguidedly challenge statements providing Y-mAbs's interpretation of clinical trial data, ¶¶ 109, 117, 149, 151-152.  "Courts have repeatedly held publicly stated interpretations of the results of various clinical studies to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions."    *Sanofi*, 87 F. Supp. 3d at 543 (cleaned up).    The AC is devoid of any contemporaneous facts showing that Y-mAbs did not genuinely believe its opinion statements interpreting clinical trial data or supplied any false supporting data or facts.  *See Gillis*, 197 F. Supp. 3d at 595 (dismissing Section 10(b) claim based on statements providing company's interpretation of clinical trial data because "SAC failed "to plead[] facts on which to conclude that defendants disbelieved their own statements") (cleaned up).    "That the FDA … ultimately disagreed with defendants' interpretation of the data does not render their subjective assessments false or misleading."  *Id.* at 598; *In re MELA Sciences Inc., Sec. Litig.*, 2012 WL 4466604, at *1, 13 (S.D.N.Y. Sept. 19, 2012) (even in the wake of an FDA communication conveying "serious concerns about the clinical trial," "Plaintiffs cannot premise a fraud claim upon a mere disagreement with how defendants chose to interpret the results of the clinical trial").

Nor can Plaintiff contrive a claim based on the failure to disclose alleged FDA "concerns" regarding the trial data.  None of the pre-CRL communications, ¶¶ 79-81, 83-88, 106, 111-112, 119, 121, 126, 131, 132, 140-141, constituted a final FDA determination, and Y-mAbs had no duty to disclose FDA's interim feedback, even if "it tended to cut against their projections."  *In re Alkermes Pub. Ltd. Sec. Litig.*, 523 F. Supp. 3d 283, 293 (E.D.N.Y. 2021) (cleaned up) (dismissing

17

10(b) claim based on failure to disclose alleged FDA "concerns" regarding statistical interpretation of clinical trial data); *see also Gillis,* 197 F. Supp. 3d at 585 n.13 ("[A] defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology.") (cleaned up).

Moreover, opinion statements that the trial results "compare[] very favorably," ¶ 109, or show "meaningful improvements" and "clinical benefit," ¶¶ 149, 151, constitute inactionable puffery and are immaterial as a matter of law.[9]  *See Emps. Ret. Sys. of the City of Baton Rouge and the Parish of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 386 (4th Cir. 2023) (statements that activity observed to date in clinical trial was "promising" and "positive" are "textbook examples of puffing statements that reasonable investors cannot rely upon"); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (statements regarding "encouraging" results and findings were "expressions of puffery and corporate optimism") (cleaned up).

### D.    Statements Regarding Prospects For FDA Approval Of Omburtamab

As a last resort, Plaintiff challenges statements regarding the prospects for FDA approval of omburtamab.  ¶¶ 97 ("We're going to resubmit" and "get the product out to the kids"), ¶ 127 ("potentially allowing for FDA approval"), ¶ 149 ("hopeful that omburtamab will be approved"), ¶ 151 ("optimistic about the potential approval"); *see Sanofi*, 87 F. Supp. 3d at 530-31 (holding that company statements regarding prospects for FDA approval are inactionable "statements of opinion" that were "protected by the PSLRA safe harbor").

---

[9] Rajah did not "make" any statements other than the inactionable statements referenced in AC paragraph 152. "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Plaintiff does not allege that Rajah, the Chief Medical Officer, had any authority over any other statements, let alone "ultimate" authority, or that he signed any Y-mAbs SEC filing.  *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) ("Because he did not sign those filings, he did not 'make' the statements they contained.") *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572  n.13 (S.D.N.Y. 2012) (*Janus* precludes making one party liable for another party's statement on an investor call).

These forward-looking statements are protected under the PSLRA safe harbor because Y-mAbs repeatedly warned investors that FDA might not approve omburtamab:

- "We may be unable to design and conduct a clinical trial to support marketing approval. Further, if our product candidates are found to … lack efficacy, we will not be able to obtain marketing approval for them and our business would be harmed." Ex. 8 at 81.

- "We do not know whether any clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety sufficient to obtain marketing approval to market our product candidates." *Id.*

- "The FDA or non-U.S. regulatory authorities may disagree with our trial design and our interpretation of data from pre-clinical studies and clinical trials." *Id.* at 82.

- "Our product candidates, including omburtamab, could fail to receive marketing approval for many reasons, including the following: the FDA … may disagree with the design or implementation of our clinical trials; we may be unable to demonstrate to the satisfaction of the FDA … that a product candidate is safe and effective for its proposed indication; the results of clinical trials may not meet the level of statistical significance required by the FDA … for approval … the FDA … may disagree with our interpretation of data from pre-clinical studies or clinical trials." *Id.* at 97.

- Study-03-133, with its "compar[ison] with data from an external cohort comprising data from the [CGCCR]," and "interim efficacy, safety, and pharmacokinetic data from Study 101" may "fail to demonstrate comparability to the satisfaction of the FDA." *Id.* at 81.

*See also* Ex. 5 at 32, 79-80, 94-95, 98 (similar in March 2021 Form 10-K); Ex. 1 at 30, 72, 90 (similar in March 2020 Form 10-K); *Shapiro v. TG Therapeutics, Inc.*, 2023 WL 405020, at *4-5 (S.D.N.Y. Jan. 25, 2023) (statements regarding likelihood of FDA approval not actionable where company warned "FDA approval could be jeopardized by further results from clinical trials"); *EDAP*, 2015 WL 5326166, at *10 (statements regarding likelihood of FDA approval not actionable where defendant "gave warnings that FDA might not approve the [defendant's] product, and no reasonable investor could have believed that there was no risk in this regard") (cleaned up).

19

These forward-looking statements are also protected under the PSLRA safe harbor because the AC is devoid of contemporaneous facts showing that, at the time of the statements, ¶¶ 97-98 (October 2020), ¶ 127 (November 2021), ¶ 149 (May 2022), ¶ 151 (August 2022), Y-mAbs had actual knowledge FDA would not approve omburtamab. *See Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *9 (D.N.J. Mar. 14, 2023) (dismissing Section 10(b) claim because "Plaintiffs do not allege any facts, particularized or otherwise, that Defendants actually knew their optimistic statements about FDA approval were false when made"); *Sanofi*, 87 F. Supp. 3d at 530-31 (holding that company statements regarding prospects for FDA approval are inactionable "statements of opinion" that are "protected by the PSLRA safe harbor").

These forward-looking statements, reflecting a "gut feeling stemming from optimistic views," are also inactionable as "mere puffery." *Aquestive*, 2023 WL 2496504, at *9; *In re Aratana Therapuetics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (statements that "do no more than place a positive spin on developments in the FDA approval process" are "mere puffery, and hence non-actionable") (cleaned up); *EDAP*, 2015 WL 5326166, at *9-10 (statements "indicat[ing] that the [FDA approval] process was 'on track' and making continued 'progress,'" or "declar[ing] defendants' belief that they were 'moving through the approval process in a timely manner'" constitute "inactionable puffery").

## II.    Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Plead Particularized Facts Giving Rise To A Strong Inference Of Fraudulent Intent

Plaintiff's Section 10(b) claim should also be dismissed for failure to adequately plead scienter. Although Plaintiff bears the burden of pleading particularized facts giving rise to a "strong inference" of fraudulent intent "with respect to each defendant and with respect to each act or omission alleged to [constitute securities fraud]," *Bristol-Myers*, 2023 WL 2308151, at *3, the AC makes generalized allegations regarding "Defendants" as a group with respect to all of the

challenged statements across a nearly two-year period as whole. *See, e.g.*, ¶¶ 166-71, 187-89. That is patently insufficient. *See In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (explaining that scienter "cannot be satisfied through group pleading").[10]

There are no allegations of stock sales by Møller or Rajah during the putative class period. Instead, Plaintiff makes the boilerplate allegation that "Defendants" as a whole were "financially motivated to misrepresent the truth and artificially inflate the market price of Y-mAbs stock." ¶ 171. That too is patently insufficient. *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as … the desire to keep stock prices high … do not constitute 'motive' for purposes of this inquiry."); *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (rejecting "generalized" motive that benefitted "shareholders, not just the defendant directors specifically").[11]

Plaintiff's allegations about Gad are both factually inadequate and untethered to the alleged fraud. Although the putative class period is October 6, 2020 to October 28, 2022, ¶ 2, and an alleged motive based on an individual defendant's stock sales requires a plaintiff to "allege not only the insider defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to *gross proceeds*, as well as overall percentage changes in defendants' holdings," *Glaser v. The9, Ltd.*, 772 F. Supp. 2d. 573, 587 (S.D.N.Y. 2011), Plaintiff dispenses

---

[10] Plaintiff also attempts to dispense with any individualized allegations of scienter on the ground that the omburtamab BLA was "critical to Y-mAbs core operations." ¶ 169. As this Court has explained, however, "it is far from clear that the core operations doctrine remains valid in light of the PSLRA." *Bristol-Myers*, 2023 WL 2308151, at *6. Moreover, "[w]hen applying the doctrine, courts have required that the operation in question constitute nearly all of a company's business." *Frankfurt-Tr.*, 336 F. Supp. 3d at 225 (cleaned up). Here, Y-mAbs already had one FDA-approved drug product, DANYELZA®; had other drug product candidates in development, Ex. 8 at 5, 9; and excluded potential omburtamab revenues from its revenue projections. Ex. 9. That is hardly the profile of a drug product that constitutes "nearly all of a company's business." *Frankfurt-Tr.*, 336 F. Supp. 3d at 225.

[11] The AC does not allege any facts even remotely suggesting that Møller's departure from the Company in April 2022, ¶ 147, was in any way related to what Plaintiff claims was a "scheme" to "deceive the investing public," ¶ 185. *See Venkataraman v. Kandi Techs. Grp., Inc.*, 2021 WL 2952260, at *5 (S.D.N.Y. Oct. 25, 2021) (finding that CFO's resignation "does not support an inference of scienter").

21

with all the requisites and provides the gross proceeds from stock sales dating back to 2019: "From 2019 through the first quarter of 2022, Gad realized gross proceeds of $43.0 million."[12]  ¶ 172. Moreover, Plaintiff does not, and cannot, allege that Gad sold significant amounts of stock just before the October 26, 2022 public release of the FDA Briefing Document.  Instead, Gad's last stock sale during the putative class period was made on February 9, 2022, "many months before the release of any negative information," rendering "Plaintiff['s] allegations [] empty vessels."  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009).[13]

Although Plaintiff bears the burden of pleading particularized facts giving rise to a "strong inference" of fraud that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314, 324, Plaintiff's theory of fraud makes little sense. Plaintiff essentially claims that, even before FDA's October 2020 RTF letter, Y-mAbs knew from FDA that the clinical trial data was inadequate and would never be sufficient.  ¶¶ 79-81, 83-88, 103.  But, as already discussed, what Plaintiff conspicuously omits from the AC is that, in May 2022, FDA accepted Y-mAbs's resubmitted BLA for filing, granted it priority review, and scheduled an ODAC meeting in October 2022 to discuss the BLA.  *Compare* ¶¶ 148-51 (skipping from May 10, 2022 to August 9, 2022), *with* Ex. 10 (May 31, 2022 press release).

The AC is devoid of any explanation why FDA would have bothered to accept the BLA for filing, grant it priority review, and convene an ODAC meeting if, as Plaintiff claims, FDA had already concluded nearly two years earlier that the clinical trial data was insufficient and approval of omburtamab would not be granted.  This undermines any "cogent" inference of fraud.  *Tellabs*,

---

[12] Plaintiff also omits that a number of stock sales during the putative class period were per a 10b5-1 plan.  Ex. 13. "[T]rades under a 10b5-1 plan do not raise a strong inference of scienter."  *Glasser*, 772 F. Supp. 2d at 592.

[13] *See also In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (four-month lapse "between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter").

551 U.S. at 324.  The opposing, non-fraudulent inference is far more compelling—*i.e.*, with its Rare Pediatric Disease, Orphan Drug, and Breakthrough Therapy designations, FDA recognized that omburtamab might provide therapeutic relief to the small patient population with CNS/LM relapse, a rare and deadly form of pediatric cancer, and that consideration of different clinical approaches was warranted given the impracticality of and ethical considerations against employing a placebo arm.[14]  Moreover, Y-mAbs's consultations with FDA regarding the issues identified in the RTF, ¶¶ 106, 112, 119, 121, 126, 131-132, 140, show that Y-mAbs tried diligently to address FDA concerns and genuinely believed that its efforts would ultimately result in FDA accepting its BLA for filing and potentially approving omburtamab thereafter.  *See, e.g., EDAP*, 2015 WL 5326166, at *3-4, 14 (notwithstanding FDA's "Major Deficiency Letter" to company and advisory panel's 9-0 vote that existing trial data did not show efficacy of prostate cancer drug product candidate, "more compelling inference" was that company sought to satisfy FDA requirements and "honestly believed that their diligence would lead to approval of their PMA application").[15]

In sum, Plaintiff has not come close to meeting his burden of pleading particularized facts giving rise to a strong inference of fraudulent intent.

---

[14] *See also* Ex. 19 at 14, 17 (draft FDA guidance recognizing that "some [trial] designs (*e.g.*, placebo concurrent control) provide more certainty than others (*e.g.*, external controls)," but noting that, for "life-threatening and severely debilitating diseases with an unmet medical need" and "certain rare diseases," "FDA experts may 'fairly and responsibly' rely on study designs that produce less certainty … when a better design is not feasible or ethical" and that "a single-arm trial with an external control" may "sometimes" be an "appropriate option").

[15] Plaintiff misses the point when he avers that "Defendants had actual knowledge that FDA would not approve the BLA for omburtamab without the demonstration of substantive evidence of effectiveness through adequate and well-controlled studies." ¶ 167.  The discussions with FDA were not about whether "adequate and well-controlled studies" were needed, but whether the clinical trial data and analyses provided by Y-mAbs adequately demonstrated effectiveness.  Y-mAbs believed that it would ultimately persuade FDA that they did, *see* ¶ 152; Ex. 14, and "misguided optimism … does not support an inference of fraud." *Carter-Wallace*, 220 F.3d at 42.

**III.    Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Adequately Plead Loss Causation**

To adequately plead loss causation, a plaintiff must allege facts showing that an alleged misstatement or omission "concealed something from the market that, when disclosed, negatively affected the value of the security." *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 445 (S.D.N.Y. 2021) (cleaned up).

Here, rather than plead facts showing the requisite causal link for *each* alleged misrepresentation, *see Castillo*, 1998 WL 342050, at *5, Plaintiff treats all of the challenged statements together in one broad brush and alleges that "[i]nvestors finally learned the truth on October 26, 2022, when FDA publicly released its Briefing Document" for the October 28, 2022 ODAC meeting. ¶ 14; *see also* ¶¶ 154-66. But the FDA Briefing Document did not correct any prior disclosures in any of the challenged statements, which span a nearly two-year period (October 5, 2020 to August 9, 2022), much less all of them:

- The FDA Briefing Document did not reveal that any of Defendants' October 2020 statements about the RTF letter, ¶¶ 91-102, were false, and Y-mAbs was under no obligation to disclose what FDA conveyed in communications "throughout 2017 to 2020." ¶ 103; *see Hoey*, 2018 WL 902266, at *14; *Sanofi*, 87 F. Supp. 3d at 542-43.

- The FDA Briefing Document did not address, much less correct, any of Defendants' then forward-looking opinion statements regarding Y-mAbs's ability to address the issues raised in the RTF letter or resubmit the BLA for filing. ¶¶ 93-95, 97, 99, 107, 115, 120, 129. Nor could the FDA Briefing Document establish the requisite causal link when, in May 2022, FDA accepted Y-mAbs's BLA for filing, granted it priority review, and scheduled the October 2022 ODAC meeting. Ex. 10.

- The FDA Briefing Document did not reveal that Defendants' statements interpreting clinical trial data, ¶¶ 109, 117, 149, 151-152, disclosed any untrue supporting facts, and "[t]hat the FDA … ultimately disagreed with defendants' interpretation of the data does not render their subjective assessments false or misleading." *Gillis*, 197 F. Supp. 3d at 598. Moreover, Y-mAbs expressly disclosed the risk that the FDA might not agree with its interpretation of the clinical trial data. Ex. 8 at 81-82, 97; Ex. 5 at 32, 79-80, 94-95, 98; Ex. 1 at 30, 72, 90.

24

- The FDA Briefing Document did not reveal that, at the time of the challenged forward-looking opinion statements regarding the prospects for FDA approval, ¶¶ 97-99, 127, 149, 151, Defendants already knew that FDA approval for omburtamab would be denied. Nor could it have. FDA did not make its final determination until after the ODAC meeting. Ex. 12.

There mere fact of a stock price decline does not mean that there was a "revelation of true facts in FDA's Briefing Document." ¶ 162. Instead, as the AC points out, the market viewed the FDA Briefing Document's differing views on the interpretation and adequacy of the clinical trial data to mean that FDA approval was unlikely.[16] ¶¶ 158-61. It was a known risk that FDA might not grant approval. Ex. 8 at 81-82, 97; Ex. 5 at 32, 79-80, 94-95, 98; Ex. 1 at 30, 72, 90. "[T]he materialization of a known risk, rather than the disclosure of a concealed one," does not "plausibly allege loss causation." *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014); *accord CRM,* 2012 WL 1646888, at *30-31.

## IV.    Plaintiff's Section 20(a) Claim Against Møller And Gad Should Be Dismissed

Because Plaintiff has failed to adequately plead a primary violation of Section 10(b), his Section 20(a) "control person" claim against Møller and Gad, ¶¶ 193-201, should be dismissed. *Bristol-Myers*, 2023 WL 2308151, at *9. The Section 20(a) claim should also be dismissed because Plaintiff has failed to plead facts raising a strong inference that Møller or Gad were culpable participants in an alleged fraud. *See supra* Argument §§ I-II*; Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014).

## CONCLUSION

For all these reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

---

[16] *See Fort Worth Emps.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (no loss causation where "[t]he all-but-inevitable decline in the [stock] price … following the company's announcement that the FDA had not approved the BVF–033 application … was caused by the agency's failure to approve the drug—not by any 'corrective' disclosure of some prior untruth.").

25

Dated:  New York, New York
        July 11, 2023

Respectfully submitted,

COOLEY LLP

/s/ Aric H. Wu
Aric H. Wu
Sarah M. Topol
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com
stopol@cooley.com

Koji Fukumura (*pro hac vice*)
10265 Science Center Dr.
San Diego, CA 92121-1117
(858) 550-6000
kfukumura@cooley.com

*Attorneys for Defendants Y-mAbs Therapeutics, Inc.,*
*Thomas Gad, Claus Juan Møller San Pedro, and*
*Vignesh Rajah*

26