# EXHIBIT 3

**S&P Global**
Market Intelligence

# Y-mAbs Therapeutics, Inc.
# NasdaqGS:YMAB
# Special Call
## Tuesday, October 06, 2020 2:00 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

1

**Contents**

# Table of Contents

Call Participants ...................................................................... 3

Presentation ...................................................................... 4

Question and Answer ...................................................................... 5

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

**2**

# Call Participants

## EXECUTIVES

**Claus Juan Møller San Pedro**
*CEO & Director*

## ANALYSTS

**Alec Warren Stranahan**
*BofA Merrill Lynch, Research Division*

**Boris Peaker**
*Cowen and Company, LLC, Research Division*

**David Neil Lebowitz**
*Morgan Stanley, Research Division*

**Etzer Darout**
*Guggenheim Securities, LLC, Research Division*

**Peter Richard Lawson**
*Barclays Bank PLC, Research Division*

**Tessa Thomas Romero**
*JPMorgan Chase & Co, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Greetings, and welcome to the Y-mAbs Conference Call. [Operator Instructions] As a reminder, this conference is being recorded.

It is now my pleasure to introduce your host for today's conference, Dr. Claus Møller. Thank you, Doctor. Please go ahead.

**Claus Juan Møller San Pedro**
*CEO & Director*

Thank you very much. Good morning, everybody, and thanks for joining us today. I'm joined today by Y-mAbs Founder, Chairman and President, Thomas Gad; and our Chief Financial Officer, Bo Kruse. We are holding this call to provide an update of securing regulatory status for omburtamab. We completed the rolling submission for the BLA for omburtamab for the treatment of pediatric patients with CNS/leptomeningeal metastasis from neuroblastoma in August this year. And late on Friday, October 2, we received refusal -- a refusal to file a letter from the FDA.

Upon its preliminary review, the FDA determined that certain parts of the CMC module and the clinical module of the BLA required further detail to complete the review. No additional nonclinical data have been requested or are required. We remain confident that we can address all points raised by the FDA, including providing the requested additional CMC information and supplementary data from Study 101, which will include tumor response data from patients with a valuable disease among the first 24 patients included in the protocol. It should also be noted that no additional clinical trials or recruitment of additional patients has been requested. Likewise, the requested additional CMC information is documentation that was planned for submission during the review period and accordingly, the information will be available within the very near future.

We plan to request a Type A meeting with the FDA within the next few weeks and plan to work in close dialogue with the agency in order to amend the BLA, with the goal of resubmitting the BLA before the end of 2020.
This marks the end of our prepared remarks. At this time, I would like to open the call for questions. Let's open the line now. Perhaps I can ask our operator to remind you the procedures for submitting questions. Thank you very much.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Our first question this morning is coming from Alec Stranahan of Bank of America.

**Alec Warren Stranahan**
*BofA Merrill Lynch, Research Division*

First one for me. Are you surprised by the FDA's determination, given the extent of prior dialogue leading up to the BLA? Are these new issues being raised that hadn't been discussed previously? And then just to be perfectly clear, do you anticipate the need to run additional clinical studies? Or is the requested CMC in clinical data already available?

**Claus Juan Møller San Pedro**
*CEO & Director*

Number one, yes, I was very surprised and of course, disappointed. And the FDA also expressed in the cover letter that they understood that we, of course, was disappointed, but they also reiterated their willingness to continue working us to swiftly get this rectified. There is no request for additional clinical data that is not already available. Was that clear?

**Alec Warren Stranahan**
*BofA Merrill Lynch, Research Division*

Yes. That was clear. And then on new time lines, what impact do you think this will have on the timing of approval? And when could we expect commercialization? Is this sort of the back half '21 timing now?

**Claus Juan Møller San Pedro**
*CEO & Director*

Yes. And it seems like that we will get a delay of somewhere around 4 to 5 months, depending on how quickly we manage to get the Type A meeting with the FDA. And shortly after the Type A meeting, we should be ready to put together the documents for refiling the BLA. So depending on how quickly we do that, if we don't manage to do it until January 5, that's a 4 months delay versus the original -- the filing, and so -- let's -- actually 5 months from August 5. And so it's 8 months from that date. So if we file November 15, 8 months later, we should hopefully have a PDUFA date. If we filed January 15, it's 8 months after that. So because it's a 60-day review period initially for the agency, and then it's a full review for another 6 months, right? It seems like we end up in the third quarter.

**Operator**

Our next question is coming from David Lebowitz of Morgan Stanley.

**David Neil Lebowitz**
*Morgan Stanley, Research Division*

I'm curious. Is there an overlap in the reviewers for omburtamab and naxitamab? And I guess, how similar are the CMC components to both those applications?

**Claus Juan Møller San Pedro**
*CEO & Director*

Thanks, David, for your question. No. Unfortunately, there's not a lot of overlap. And in particular, there's a lot of new people that have come on to the review team for omburtamab.

In terms of documentation for the CMC for the 2 products, I think you cannot really compare. And for the naxitamab, we are beyond the discussion with the agency on the CMC part of that file. As you know, we are approaching a PDUFA date towards the end of November, and we have had our late cycle review meeting with the agency. And we do not see any major issues that has been discovered by the agency for

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

any of the 3 parts of the trial. So this has absolutely no influence to the naxitamab filing, and we consider that as being completely on track for approval within the next very short period of time.

And you can see the documentation that we have provided is in the same magnitude as we are planning to provide for omburtamab. A lot of the documentation that the FDA has asked for to be included in the filing, and which was a part of the reason for the refuse to file, was planned for submission during the review process. And I think that narrowing the time line for the review is to actually evaluate this information has probably made the FDA feeling so squeezed for time to stick with the very short review for these fast-track reviews that they felt it was too much of a [ laborsome ] process for them also.

We're going to meet with them as soon as we can for the Type A meeting. We are going to rectify this. We're going to resubmit. And we'll get the product out to the kids, so they can get help from it.

**David Neil Lebowitz**
*Morgan Stanley, Research Division*

So more or less, on the delay, it seems that you -- the suggestion is it's -- the information is already there. You already have it. It's more of packaging it, providing it to the agency.

**Claus Juan Møller San Pedro**
*CEO & Director*

Yes. So the clinical information is there. We, of course, need to write some of the standard documents to include them formally in the filing when we are talking about a few weeks of work. The majority of the CMC information is here already, and the rest will be available during November. So I see no major obstacles. And as I said, we had known that for a long time, and we were just expecting to file that as additional filings during the review process. You get requests for information. You include the information, and you provide it. But they apparently didn't want it that way.

**Operator**

Our next question is coming from Etzer Darout of Guggenheim.

**Etzer Darout**
*Guggenheim Securities, LLC, Research Division*

Great. Just 1 question, sort of given sort of the timing now and if you think about the EU application, is it just feasible that this potential time lines are sort of merged? Or do you anticipate any sort of similar issues with the EMA in terms of their request for information? How do you kind of view the packaging for the EU relative to what we're seeing here in the U.S.?

**Claus Juan Møller San Pedro**
*CEO & Director*

I think the information that we will need for the refiling of the BLA is the information that we'll also need to go into the EMA filing. And the EMA filing is currently scheduled for beginning of February.

**Operator**

[Operator Instructions] Our next question is coming from Boris Peaker of Cowen & Company.

**Boris Peaker**
*Cowen and Company, LLC, Research Division*

I was just wondering if you could be more specific on what CMC module was missing or incomplete. And does it include any third-party manufacturers?

**Claus Juan Møller San Pedro**
*CEO & Director*

Well, some of the material is manufactured -- done for us by third parties, but it is -- like it's stuff like priority in testing and a number of in-process validation documentation that we were in the process of

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

providing, putting together. And that, as I said recently to the previous question, will be completed during this month and November. And we had anticipated that the FDA would have been okay with us providing that information while they were reviewing the document. And apparently, they decided that was not the way it was going to go. So we will now include everything, and we'll meet with the FDA and make sure that we have responded adequately to everything. And after the Type A meeting, we will, of course, guide the market about our plan forward from there.

**Boris Peaker**
*Cowen and Company, LLC, Research Division*

Got you. And just on the clinical side, I mean you mentioned that you're going to be submitting data from Study 101. Did the FDA specifically say what additional clinical data they would like to be part of the package in terms of number of patients follow-up or any...

**Claus Juan Møller San Pedro**
*CEO & Director*

Yes.

**Boris Peaker**
*Cowen and Company, LLC, Research Division*

So what specifically did they request?

**Claus Juan Møller San Pedro**
*CEO & Director*

They requested 2 things. One thing was a different type of statistical comparison between the data from Study 03-133 and the old study with more than 100 patients and the historical controls. It's not a problem. We can do it, and we already started working on that this week. The other thing they specifically requested was tumor response data for patients from Study 101, where the tumor responses has been independently evaluated according to the RANO criterias for measuring tumor responses in the central nervous system. That was a long one.

So a little historical background. Until 2015, there were no standardized evaluation of tumor responses in the central nervous system, as you have the RECIST criterias for solid tumors systemically. In 2015, the RANO criterias was established and agreed on, so now you had a standardized way of measuring effect on tumors in terms of response in the central nervous system. When we did the protocol for Study 101, in agreement with the FDA, we included tumor response evaluations, where we are looking at the tumor before the first dose of omburtamab, and we are following the response of the patients up to week 26, half a year later. And the FDA want to see tumor responses for those patients among the first 24 patients in Study 101 that have measurable disease. And they want to have that included in the package because they found out we have the data, and that they believe that, that can give them the necessary confidence that this is sufficient to establish that there is a direct antitumor effect of omburtamab.

So very clear, and we have everything, and I have no concern that the FDA will think, "Oh, that is not sufficient response." I think we are beyond that also.

**Boris Peaker**
*Cowen and Company, LLC, Research Division*

And when will we, as investors, see that data with the RANO criteria?

**Claus Juan Møller San Pedro**
*CEO & Director*

As soon as possible after the FDA have accepted that this is sufficient to support the BLA.

**Operator**

Our next question is coming from Peter Lawson of Barclays.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Peter Richard Lawson**
*Barclays Bank PLC, Research Division*

Do you foresee any impact on the rest of the pipeline, kind of anything else B7-H3-related or of the label-related?

**Claus Juan Møller San Pedro**
*CEO & Director*

Thanks, Peter, for the very easy question. The answer is very easy. No.

**Peter Richard Lawson**
*Barclays Bank PLC, Research Division*

Okay. Perfect.

**Claus Juan Møller San Pedro**
*CEO & Director*

And it's not going to affect the initiation of our DIPG study with omburtamab. It's going to start as planned. I'll be ready for enrolling patients by the end of this year.

**Peter Richard Lawson**
*Barclays Bank PLC, Research Division*

Got you. And then the new data, will we see that after you've filed? And is there any...

**Claus Juan Møller San Pedro**
*CEO & Director*

Well, I mean, we...

**Peter Richard Lawson**
*Barclays Bank PLC, Research Division*

How do we kind of bridge between that kind of new RANO criteria and your prior cuts for the data?

**Claus Juan Møller San Pedro**
*CEO & Director*

Well, the only tumor response data we have ever talked about before was in -- and it's several years back we mentioned them. That was when we were getting breakthrough designation for omburtamab with more than 4 years ago, where among the first 80 patients, because the FDA over then was kind of like, "Hey, can you show us something that demonstrate that there is a direct antitumor effect of omburtamab? We understand that the majority of your patients has received surgery, radiation and chemotherapy, and they're going to die anyway. And that, therefore, most of them will have no measurable disease, but maybe some of them has. Could you look for that?"

We found out that among the first 80 patients in the MSK Study, 19 patients had measurable disease. But of course, there were no RANO criterias, and there were no formalized tumor response evaluation, so we looked up for as much information with radiographic scans from these patients as we could. And we had the principal investigator, Dr. Kramer, looking at these scans. And her conclusion was that of those 19 patients, 6 had an objective response to the treatment -- sorry, 7, and 6 patients had stable disease and 6 patients had progressive disease.

Now those data were not validated, and it was done by the investigator, and they were not prospectively planned, and they were not based on scans that was taken at predefined time points. So it was really not -- it was great for the FDA because they said, "Fine. That was what we were looking for. We're going to give you a breakthrough designation." And then they asked us politely to build it into our prospective study. And originally, they had agreed to let us provide this information as a post-marketing commitment, but now they realize that we have the data actually available for the first 24 patients. And of course, they understand their point. They are giving us an approval for a product where there's basically no direct

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

antitumor effect. The only thing we are measuring is what everybody really wants, which is survival, but it would be nice to see that yes, there is survival. And yes, this has direct antitumor effect.

So data is there. We are going to provide them. And we're, of course, going to share them as soon as possible after the FDA has accepted it's sufficient.

**Peter Richard Lawson**
*Barclays Bank PLC, Research Division*

Great. And you had mentioned that the FDA panel had changed kind of mid-filing, is that right? When did that happen?

**Claus Juan Møller San Pedro**
*CEO & Director*

Well, no. There's just that when you go to meetings like the pre-BLA meeting, et cetera, there's a team that's there, and it's not necessarily the same team that will be then allocated to actually review your documentation. And a number of people have been changed and new people to the program. And -- I mean, the FDA, like everybody else, is on the massive pressure because of the lack of ability to work normally in these COVID-19 times. So I mean I think there's no malice anywhere here, and the FDA has been extremely polite and collaborative and also been very open in saying that they understand, of course, that this is very disappointing, and they really want to emphasize that they want to work with us on getting this successfully refiled and approved as quickly as possible.

So I think we still have a very good collaboration there, and we have a lot of support from the FDA for this program. And we just have to accept that they also have a limitation to -- even though this is an extremely rare pediatric oncology indication, there's a limitation to what they can do also. And they have given us some very clear guidance on how to refile. So I think we -- this is annoying. It's irritating, and it spoiled my weekend sleep, but we are back on track. We're working hard. We're getting these things done.

**Operator**

[Operator Instructions] Our next question is coming from Anupam Rama of JPMorgan.

**Tessa Thomas Romero**
*JPMorgan Chase & Co, Research Division*

Claus, this is Tessa on the call this morning for Anupam. Just one from us. We just wanted to confirm that the inspection site visits for naxitamab have been completed.

**Claus Juan Møller San Pedro**
*CEO & Director*

Yes.

**Tessa Thomas Romero**
*JPMorgan Chase & Co, Research Division*

And I guess -- yes, that's our first one. Yes.

**Claus Juan Møller San Pedro**
*CEO & Director*

Okay. So that's fine. That's done.

**Tessa Thomas Romero**
*JPMorgan Chase & Co, Research Division*

Okay. Okay. And then I guess, second question on sort of your earlier comments on the expansion indications care right for DIPG and DSRCT. We had thought you were going to sort of engage with regulators post sort of completing birth to that regulatory process. Can you just provide a little bit more granularity on your earlier thoughts, why there is no delay there on either of those programs?

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Claus Juan Møller San Pedro**
*CEO & Director*

Well, yes, sure. In terms of DIPG, as you know, although the data starts to look very good in the single-center study that is currently ongoing at MSK and Cornell, we need a multicenter study for the FDA to consider expanding the indication for omburtamab. And that multicenter study, we have worked with the pediatric brain tumor consortium in the U.S. to find out who would be interested and had possibility to participate. And we are starting a multicenter study, Y-mAbs-sponsored multicenter study, and that study will use the highest dose level -- dose cohort level that we had reached in a dose escalation study. While that study is ongoing, it turns out that it can safely dose escalate further. We may even do that. But we needed the multicenter study underway.

And then as I said, I see no reason why the fact that we will not be discussing this with the FDA until 4 months later than originally anticipated because it would delay anything because we need to wait for the data from the multicenter study, which would probably not be available until 2022 anyway. So I don't think that's going to impact it.

On the desmoplastic small round cell tumor, it's still a little early to predict where that's going to end up. It's such a small little indication. And we have a Phase II study ongoing as a single-center study at MSK. And I -- that would not be the first discussion we would have with the agency. The next one to go for would be the DIPG. Did that answer the question?

**Tessa Thomas Romero**
*JPMorgan Chase & Co, Research Division*

Yes. That's did.

**Operator**

Dr. Møller, we're showing no questions in queue at this time. Do you have any additional or closing comments?

**Claus Juan Møller San Pedro**
*CEO & Director*

I just want to thank everybody for participating today. And I hope you will join me in the understanding that, yes, this is a minor setback. And it's, of course, a disappointment, but rest assured that we are going to do everything that is humanly possible to make sure that omburtamab is getting refiled and coming out to the kids that urgently need access to this treatment to cure their brain tumors.

Thank you very much, everybody, for participating today.

**Operator**
Ladies and gentlemen, thank you for your participation. This concludes today's event. You may disconnect your lines and log off the webcast at this time, and have a wonderful day.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.