UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| IN RE Y-mAbs THERAPEUTICS, INC. SECURITIES LITIGATION | Civil Action No.: 1:23-cv-00431-AS<br><br>CLASS ACTION |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     FACTUAL ALLEGATIONS.......................................................................................4

      A.      BACKGROUND – Y-MABS AND OMBURTAMAB.................................................4

      B.      FDA REGULATORY BACKGROUND .......................................................................4

      C.      THE EXTERNAL CONTROL FROM CGCCR COULD NOT SUPPORT EFFICACY OF OMBURTAMAB BECAUSE IT WAS NOT AN ADEQUATE COMPARATOR ....................5

      D.      Y-MABS DID NOT SUBMIT RELIABLE TUMOR RESPONSE RATE DATA AS NO PATIENT IN STUDY 101 DEMONSTRATED A RESPONSE THAT COULD BE UNEQUIVOCALLY ATTRIBUTED TO OMBURTAMAB ................................................7

      E.      FDA REPEATEDLY INFORMS Y-MABS THAT CGCCR DATA COULD NOT SUPPORT EFFICACY OF OMBURTAMAB BECAUSE IT WAS NOT AN ADEQUATE COMPARATOR 7

      F.      DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ....................9

      G.      THE TRUTH IS REVEALED...................................................................................11

III.    ARGUMENT ............................................................................................................12

      A.      PLAINTIFF ADEQUATELY ALLEGES FALSE AND MISLEADING STATEMENTS...........13

            1.      Defendants' Statements of Fact Are Actionable....................................13

            2.      Defendants' Assurances That They Could Remedy Deficiencies in the CGCCR Data Are Actionable ................................................................19

            3.      Defendants' Remaining Statements Are Actionable..............................19

      B.      PLAINTIFF HAS ALLEGED A STRONG INFERENCE OF SCIENTER .............................21

      C.      PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION .........................................24

      D.      PLAINTIFF ADEQUATELY ALLEGES SECTION 20(A) CLAIMS................................25

IV.     CONCLUSION .........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ...................................................................................................16

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995) .......................................................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................13

*Berger v. Apple REIT Ten, Inc.*,
563 F. App'x 81 (2d Cir. 2014) ..............................................................................................13

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ..............................................................................................17, 24

*City of Livonia Employees Ret. Sys. v. Wyeth*,
2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010) ...................................................22

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989) ........................................................................................................23

*Credit Suisse First Bos. Corp. v. Arm Fin. Grp.*,
2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001)....................................................5, 21

*Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013) .....................................................................................23

*Duncan v. Pencer*,
1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) ..............................................................................23

*Employees' Ret. Sys. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................................................4, 22

*Gerneth v. Chiasma, Inc.*,
2018 U.S. Dist. LEXIS 25524 (D. Mass. Feb. 15, 2018) ..................................................17, 21

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) .....................................................................................20

*Hoey v. Insmed, Inc.*,
2018 WL 902266 (D.N.J. Feb. 15, 2018) ...............................................................................16

*In re Alkermes Pub. Co. Sec. Litig.*,
523 F. Supp. 3d 283 (E.D.N.Y. 2021)....................................................................................20

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................................22

*In re Avon Sec. Litig.*,
2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019)....................................................23

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................17

*In re Carter-Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000) .....................................................................................................21

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014).......................................................................................25

*In re Extreme Networks Sec. Litig.*,
2018 U.S. Dist. LEXIS 46638 (N.D. Cal. Mar. 21, 2018) .....................................................18

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012).....................................................................................22

*In re GPC Biotech AG Sec. Litig.*,
597 F. Supp. 2d 412 (S.D.N.Y. 2009).....................................................................................24

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018)...................................................................................18

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010).....................................................................................22

*In re Nash Finch Co. Sec. Litig.*,
502 F. Supp. 2d 861 (D. Minn. 2007) .....................................................................................18

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. July 30, 2015).......................................................................17

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015).......................................................................................16

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .....................................................................................................12

*In re Twinlab Corp. Sec. Litig.*,
   103 F.Supp.2d 193 (E.D.N.Y. 2000)......................................................................23

*In re Vale S.A. Sec. Litig.*,
   2020 U.S. Dist. LEXIS 91150 (E.D.N.Y. May 20, 2020) ......................................17

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ........................................................................... 13, 24

*Kleinman v. Elan Corp.*,
   *plc*, 706 F.3d 145 (2d Cir. 2013).........................................................................13

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ..................................................................................12

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S.Ct. 1309 (2011) ...........................................................................................13

*Meyer v. JinkoSolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ..................................................................................13

*Noto v. 22nd Century Grp., Inc.*,
   2023 WL 122305 (W.D.N.Y. Jan. 6, 2023)............................................................22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................................... 12, 18

*Omnicare, Inc., v. Laborers Dist. Council Cons. Indus. Pension Fund*,
   575 U.S. 175 (2015) ....................................................................... 16, 19, 21

*Rosenbaum Capital, LLC v. McNulty*,
   549 F. Supp. 2d 1185 (N.D. Cal. 2008)..................................................................18

*Sanders v. Aveo Pharm., Inc.*,
   2015 U.S. Dist. LEXIS 35116 (D. Mass. Mar. 20, 2015) ............................... 17, 20

*Slayton v. American Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ..................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...............................................................................................21

*Todd v. STAAR Surgical Co.*,
   2016 U.S. Dist. LEXIS 186511 (C.D. Cal. Apr. 12, 2016) ....................................18

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ......................................................................... 3, 16, 17

*Trust of Chi.*,
   553 F.3d 187 (2d Cir. 2009) ...................................................................................21

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ...................................................................................18

**Statutes**

15 U.S.C. § 78j(b) ................................................................................................ 1, 25

15 U.S.C. § 78t(a) ................................................................................................ 1, 25

PSLRA ............................................................................................................... 12, 20

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................12

**Other Authorities**

17 C.F.R. § 240.10b-5 ........................................................................................ 1, 12

21 CFR 314.126 ............................................................................................... 4, 5, 6

## I.    **PRELIMINARY STATEMENT**

This is a federal securities class action on behalf of all investors who purchased the common stock of Y-mAbs Therapeutics, Inc. ("Y-mAbs" or the "Company"), during the period October 6, 2020 through October 28, 2022, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company, founder and former Chief Executive Officer ("CEO") Thomas Gad ("Gad"), former CEO Claus Juan Moller San Pedro ("Moller") and Senior Vice President Chief Medical Officer, Vignesh Rajah ("Rajah").

Y-mAbs is a biopharmaceutical company. During the Class Period, the Company's "lead product candidate" was omburtamab, which was designed to treat patients with neuroblastoma that relapsed in the central nervous system ("CNS") or leptomeninges ("LM"). Y-mAbs's goal has always been to obtain FDA approval of omburtamab through a Biologics License Application ("BLA"), seeking to demonstrate its efficacy by comparing the overall survival ("OS") results in the single-arm "Study 03-133" with an external control constructed from data from the Central German Childhood Cancer Registry ("CGCCR").

On October 5, 2020, Y-mAbs issued a press release informing investors that it had received a Refusal To File ("RTF") letter from FDA regarding its BLA. Defendants did not release the RTF to investors. Instead, in the press release and during a conference call, they assured investors that the RTF was issued merely for non-substantive reasons that and confirmed that they were "new issues being raised that hadn't been discussed previously," but that it was a "minor setback," "not a problem," they "have everything" to cure the deficiencies and that there was "no concern that the FDA will think, 'Oh, that is not sufficient response.'"

1

In truth, Defendants knew but failed to disclose that the RTF letter identified fundamental flaws in Y-mAbs data, concluding the "application did not contain substantial evidence consisting of adequate and well-controlled investigations that 131I-omburtamab is safe and effective." Moreover, the deficiencies were not "new issues" as Defendants claimed. FDA had repeatedly warned Y-mAbs prior to its BLA that the patient population in Study 03-133 was not comparable to the population in CGCCR. Defendants also knew that they had not and could not address the deficiencies because, for example, FDA required the resubmission to include a comparison of patients that also received craniospinal irradiation but zero patients in CGCCR data received that treatment whereas 91% of Study 03-133 patients did.

As Y-mAbs and FDA discussed the possible resubmission of the BLA, FDA maintained its position that "the CGCCR external control was not fit-for-purpose due to lack of granular patient-level data" and was not an adequate comparator. However, Defendants' misled investors about these meeting at every turn. For example, during a November 3, 2020 meeting, FDA warned that the CGCCR data was still not comparable because "an imbalance in receipt of radiation treatment." Nevertheless, on November 6, 2020, Moller proclaimed "[w]e have resolved all the issues that [FDA] have requested." During the meetings that followed FDA told Y-mAbs (i) the CGCCR data was fundamentally flawed, (ii) Y-mAbs had failed to cure the deficiencies, (iii) aspects of Y-mAbs analysis were "arbitrary," (iv) "there was insufficient information to provide agreement on the efficacy package to support the BLA," and (v) without an adequate comparator "an alternative clinical development program will need to be discussed." Defendants conveyed none of this to investors. Instead, they went out of their way to repeatedly reassure the market that (i) "all the information that we need, we have," (ii) FDA and the Company were "aligned" on the resubmission, (iii) there was a "clear regulatory path forward," (iv) the resubmission was

2

"progressing as planned," (v) the CGCCR data was "not something that is holding up the submission," and (vi) "Y-mAbs is confident that it can address all points raised by the FDA" – claiming that FDA was "happy" with the data and Y-mAbs was "pleased" with each meeting.

Finally, despite telling investors that they would not file the BLA until they "reach a final agreement with the agency" and "get a green light," Defendants resubmitted the doomed BLA on March 31, 2022, because they had reassured investors that it would be filed in Q1 2022.

Investors began to learn the truth On October 26, 2022, when FDA publicly released its Briefing Document for the Oncologic Drugs Advisory Committee ("ODAC") meeting scheduled for October 28, 2022, concluding that "difference in survival cannot be reliably attributed to omburtamab," because "[t]he external control population is not fit-for-purpose as a comparator due to substantive differences between the study and control populations." Emphasizing that the BLA was dead-on-arrival, the Briefing Document identified the numerous meetings since 2016 during which it warned Y-mAbs that the CGCCR data was not adequate, even **bolding** certain communications and emphasizing that despite the dire warnings "Y-mAbs elected to resubmit the BLA on March 31, 2022 prior to reaching agreement with the FDA." On Friday, October 28, 2022, Y-mAbs announced that the Advisory Committee had voted unanimously 16 to 0 to deny approval. As a result of these disclosures, Y-mAbs stock price plummeted 76%, from $15.17 to $3.61.

In their Motion, Defendants argue that all the statements above are opinions and are not misleading (or made with scienter) because Plaintiff has not alleged that Defendants did not "truly believe" the statements. They are wrong on the facts and law. First, most of Defendants' statements are actionable statements of fact. The few opinion statements are also actionable because, Defendants "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016) (citing *Omnicare,*

*Inc., v. Laborers Dist. Council Cons. Indus. Pension Fund*, 575 U.S. 175, 186, 196 (2015). Scienter follows because Plaintiff alleges – and Defendants do not dispute – that they knew about FDA's repeated warnings. *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (scienter alleged "where defendants . . . knew facts or had access to information suggesting that their public statements were not accurate…") (quotations omitted).

Defendants' remaining arguments should be rejected for the reasons stated herein.

## II.    FACTUAL ALLEGATIONS

### A.    Background – Y-mAbs and Omburtamab

Y-mAbs is a biopharmaceutical company focused on the treatment of cancer. ¶31 During the Class Period, the Company's "lead product candidate" was omburtamab, (¶31) which was designed to treat patients with neuroblastoma that relapsed in the CNS or LM. ¶33

Development of omburtamab was initiated with "Study 03-133," which was a single-arm trial with no control group. ¶37 The trial was initiated in 2004 with enrollment closing in 2018. The efficacy population consisted of patients with CNS/LM relapsed neuroblastoma who received omburtamab. The primary endpoint was OS at 3 years. ¶38

Importantly, prior to receiving omburtamab, all patients received at least one type of CNS-directed therapy, including surgery (83%), chemotherapy (98%), and radiotherapy (93%). The majority (76%) of patients received all three treatment modalities. ¶39

### B.    FDA Regulatory Background

Pursuant to 21 CFR 314.126, a drug will receive FDA approval only if it demonstrates "substantial evidence of effectiveness" through two or more adequate and well-controlled trials or by a single adequate and well-controlled trial with supportive evidence. ¶¶43-44 The fundamental "purpose" of the clinical investigation into efficacy is to distinguish the effect of the drug "from other influences." ¶45 (quoting 21 CFR 314.126) Randomized trials are required with rare

4

exception to assess the effect of a drug on OS because this allows researchers to control for other factors that could impact the results. ¶¶46-47

By contrast, in a single-arm trial, all patients receive the investigational drug and the researchers aim to evaluate its effectiveness by comparing it to data external to the study. ¶48 As a result, there may be differences in baseline patient characteristics or concomitant treatments that lead to differences in outcomes that are unrelated to the drug. *Id*. This significantly increases the risk that any observed efficacy could be the result of other factors, such as additional treatments, standard of care, or the varying baseline condition of the patients. ¶¶48-50

When randomized trials are not feasible, an adequate and well-controlled single-arm trial may rely on an external control; however, regulations require that the comparison of the results of treatment occur in "***comparable patients or populations***." ¶51 (quoting 21 CFR 314.126)

### C.    The External Control from CGCCR Could Not Support Efficacy of Omburtamab Because It Was Not an Adequate Comparator

Y-mAbs pursued FDA approval of omburtamab through a BLA (¶54) and sought to demonstrate its efficacy by comparing the OS in Study 03-133 with an external control constructed from data from the CGCCR, which includes patient data from 1990 to 2015. ¶55 However, the CGCCR population was not "fit-for-purpose" as a comparator, preventing attribution of the survival differences to the effect of omburtamab. ¶56

***First***, Study 03-133 included patients that relapsed between 2005 and 2018, whereas the CGCCR included patients that relapsed as far back as 1990. ¶57 Because survival of patients with CNS/LM relapse has improved significantly over the last 30-years as additional treatments have been applied, the results were biased in favor of Study 03-133. *Id*. For example, patients in the CGCCR treated between 1990 and 2005 (prior to the start of Study 03-133) had a median OS of

5

9.6 months (¶58) whereat patients treated between 2005 and after (which overlapped with Study 03-133) had a median OS of 15.7 months. *Id.*

*Second*, the patients in Study 03-133 had a significantly better "baseline clinical status." ¶59 In order to qualify for enrollment in Study 03-133, patients had to be well enough to travel to the site and sufficiently recovered from other intensive treatments (*e.g.* surgery, chemotherapy or radiotherapy). *Id.* The CGCCR had no such requirement. *Id.* Therefore, the higher OS rate from Study 03-133 could be the result of the study omitting the patients least likely to survive. *Id.*

*Third*, in measuring OS for Study 03-133 and the CGCCR, Y-mAbs used as a start date the last post-CNS relapse treatment. ¶60 However, because every patient included in Study 03-133, by definition, must have survived for the months between their last treatment and traveling to receive omburtamab, the start date biased any analysis in favor of Study 03-133. *Id.* Notably, during that time period, 30% of patients in the CGCCR died. *Id.* Thus, the higher OS rate from Study 03-133 could be explained by the study not including these patients when CGCCR did. *Id.*

*Fourth*, patients in Study 03-133 received more intensive treatment than those in the CGCCR. ¶61 This biased the results in favor of omburtamab because there was a clear trend toward improved survival with higher treatment intensity in the CGCCR. Common treatments for CNS/LM relapse are (i) radiation therapy, (ii) craniospinal irradiation, and (iii) chemotherapy. CGCCR patients who received one therapy had a median OS of 9.9 months. ¶62 Patients who received two therapies had a median OS of 16.0 months. Patients who received all three therapies had a median OS of 29.8 months. *Id.* This demonstrated a clear trend for improved survival in CGCCR patients that was more comparable to treatment received by Study 03-133 patients. *Id.* This trend biased the results of Study 03-133 over the CGCCR external control population. ¶63 While 76% of patients in Study 03-133 received all three treatments, only 27% of patients in

CGCCR received all three treatments. Indeed, **91% of patients in Study 03-133 received craniospinal irradiation** whereas **zero patients in CGCCR received that treatment**. *Id.*

### D.    Y-mAbs Did Not Submit Reliable Tumor Response Rate Data As No Patient in Study 101 Demonstrated A Response That Could Be Unequivocally Attributed To Omburtamab

Efficacy in oncology single-arm trials has relied on objective tumor response which removes the uncertainty around attribution of the effect to the drug under study rather than other confounding influences. ¶¶51, 66 To this end, Y-mAbs sought to demonstrate efficacy of omburtamab by also including interim data from "Study 101." It sought to establish direct evidence of an anti-tumor effect of omburtamab. *Id*. However, because Study 101 patients received multi-modality CNS-directed anti-cancer therapy prior to receiving omburtamab, they had minimal CNS disease at baseline prior to receiving omburtamab. ¶70 Furthermore only 4 of the 50 patients had responses that were identified by an initial independent follow-up review, as required by the relevant guidelines. ¶¶70-71 Even among these four there was disagreement between the primary radiology reviewers in all cases. ¶73 **Overall, <u>no patient</u> in Study 101 demonstrated an unequivocal treatment response that could be attributed to omburtamab**. ¶75

### E.    FDA Repeatedly Informs Y-mAbs That CGCCR Data Could Not Support Efficacy of Omburtamab Because It Was Not An Adequate Comparator

Prior to the initial BLA submission, FDA held multiple meetings with Y-mAbs, repeatedly stating that the CGCCR data was not an adequate comparator.  ¶¶77-76 As FDA has stated:

> ***Early on, we cautioned*** … ***and consistently highlighted*** that the ability to interpret the data would largely depend on the comparability of the populations and…the receipt of so much intensive treatment prior to administration of omburtamab…***would likely make it difficult to determine if any effects on survival are due to omburtamab and not to those treatments***.

¶78 For example, during a December 9, 2016 meeting, FDA stated there were "important limitations to the data from Study 03-133 such as the ability to isolate the treatment effect of

7

omburtamab from other treatments for relapsed disease." ¶79 On May 18, 2017, FDA told Y-mAbs point-blank that the data from 03-133 "*did not constitute substantial evidence of the safety and effectiveness required to support approval*." ¶80 During a June 14, 2017 meeting, FDA warned that "the proposed study was inadequate to characterize the efficacy of omburtamab." ¶81 On November 19, 2019, FDA again warned Y-mAbs about the "*important limitations* to the data provided from Study 03-133." ¶86 FDA issued an Advice Letter on December 12, 2019 and held a meeting on February 25, 2020, warning Y-mAbs yet again about the mis-matched data. ¶¶87-88

Undeterred, on August 5, 2020, Y-mAbs submitted its initial BLA. ¶89 On October 2, 2020, FDA issued an RTF letter, declining approval of omburtamab, stating that the "*application did not contain substantial evidence consisting of adequate and well-controlled investigations that 131I-omburtamab is safe and effective*." ¶90 The RTF letter stated:

> The treatment effect of $^{131}$I-Omburtamab *cannot be objectively established or quantified* based on the results from Study 03-133 compared to the reference rate derived from the CGCCR external control.

*Id*. FDA stated that Y-mAbs was required to "reanalyze[]" the data for "important baseline characteristics" such as "prior receipt of craniospinal irradiation." *Id* FDA also concluded "it will be important for the external control data to reflect a patient population and follow-up to that is comparable to Study 03¬133." *Id*.

It was impossible for Defendants to provide the "important" new analyses that FDA required. For example, the RTF letter required Y-mAbs to control for "prior receipt of craniospinal irradiation," however, while 91% of the patients in Study 03-133 received craniospinal irradiation *zero* CGCCR patients received that treatment. ¶63 It was similarly impossible for the CGCCR data to reflect a "follow-up" that is "comparable to Study 03¬133" because post-omburtamab treatment was not captured in Study 03-133. ¶64

8

### F.       Defendants' False and Misleading Class Period Statements

Defendants did not disclose the RTF letter to investors. Instead, Y-mAbs issued a press release on October 5, 2020 and held an a call on October 6, 2020, suggesting to investors that the RTF letter identified non-substantive deficiencies that were "a minor setback," ¶101 reassuring investors that "Y-mAbs is confident that it can address all points raised by the FDA." ¶¶93, 95. Moller stated definitively "It's not a problem. We can do it…So very clear, and *we have everything, and I have no concern that the FDA will think, 'Oh, that is not sufficient response.'*" ¶100 When asked point-blank by an analyst: "*[a]re these new issues being raised that hadn't been discussed previously?*" Moller lied, responding, *"yes, I was very surprised*." ¶96.

During the next meeting on November 3, 2020, FDA repeated that "the CGCCR external control data may not be fit-for-purpose…in that the patient populations may not be comparable. *Specifically, there appears to be an imbalance in receipt of radiation* treatment…, specifically craniospinal irradiation [CSI], compared to the patients in the CGCCR external control where *no patients received CSI*." ¶106 Nevertheless, in Y-mAbs's earnings call on November 6, 2020, Moller stated "*it's pretty clear that*…*we have resolved all the issues that they have requested*" and "Y-mAbs is confident that it can address all points raised by the FDA." ¶107

Recognizing that the CGCCR data was inadequate, Y-mAbs examined SIOPEN data but informed FDA that it also was inadequate because "data on post-CNS relapse was not available." ¶112 On January 7, 2021, FDA informed Y-mAbs of its conclusion that "*the CGCCR external control was not fit-for-purpose due to lack of granular patient-level data*." ¶111 FDA and Y-mABs held a teleconference the next day in which Y-mAbs admitted the "the difficulties associated with obtaining patient-level data that would be of sufficient quality and granularity to serve as an appropriate external control" and suggested abandoning the comparison entirely, instead asking if they could obtain approval only through "demonstration of durable overall responses in patients with

9

measurable disease enrolled in Study 101." ¶112 However, FDA had repeatedly told Y-mAbs that such an analysis would only be sufficient when combined with a comparison to an external control that was deemed "fit for purpose." *E.g.*, ¶¶83-90, 119.

Despite admitting to FDA that neither the CGCCR or SIOPEN databases could serve as an adequate external control, Moller stated during a February 26, 2021 earnings call, "[w]e remain confident that we can address all points raised by the FDA." ¶115 Falsely asserting that a "good thing" that occurred was that they discovered the SIOPEN database, which contained "*more granularity and details… So now we have 2 sets of historical controls… which the FDA seems to be very happy about*." ¶117

During a meeting on March 26, 2021, FDA again told Y-mAbs, "insufficient information was provided to determine whether the data from CGCCR are fit-for-purpose," and concluded "if ultimately FDA cannot determine if the patient populations are similar enough…*an alternative clinical development program will need to be discussed*." ¶119

Nevertheless, on June 23, 2021, Y-mAbs issued a press release stating "[b]ased on our discussions with the FDA, we believe we now have a clearer path towards the resubmission of the omburtamab BLA to the FDA," and Moller stated, "[w]e are very pleased to be aligned with the FDA on the next step towards the resubmission of the Omburtamab BLA...." ¶122 On November 5, 2021, Gad reassured investors that "the resubmission of the omburtamab BLA is progressing well" and Moller stated, "[n]eedless to say, we are very pleased to be aligned with the FDA on the next steps." ¶127 On December 15, 2021, Moller stated, "we expect to get a green light …I think we have put together a very strong package that should satisfy the concerns the FDA raised at the refused file and that they have also raised during our discussions." ¶129

10

During a January 13, 2022 meeting with Y-mAbs, FDA again repeated that "*there was insufficient information to provide agreement on the efficacy package to support the BLA*," identifying certain adjustments to the data proposed by Y-mAbs as "arbitrary," and specifically stating that the inability to audit the CGCCR data would be "*a filing issue*." ¶¶131-32

Defendants continued to blatantly mislead investors:

- On February 11, 2022, Gad stated, "[w]e are pleased with the outcome of the pre-BLA meeting for Omburtamab providing a clear regulatory path forward for the resubmission of the BLA." ¶133

- On February 25, 2022, Gad reassured analysts and investors, "[t]he resubmission of omburtamab BLA is progressing as planned," and that during the January meeting, FDA "confirmed our path towards a BLA resubmission in March." ¶137 Moller again stated, "we are very pleased to be aligned with the FDA on the next step." Id. Directly contradicting FDA's conclusions during the January meeting, Moller stated, "all the information that we need, we have" and that auditing the CGCC data was "not something that is holding up the submission of the BLA filing." ¶138

Finally, despite previously assuring investors that the Company would not resubmit the BLA until they "reach a final agreement with the agency" (¶115) and "get a green light," (¶129) on March 31, 2022, Y-mAbs resubmitted the BLA without FDA's agreement. ¶142 On April 1, 2022, Y-mAbs issued a press release lauding the submission with Gad stating "I am excited to see the completion of Y-mAbs' second BLA submission…" ¶143 Analysts responded positively to the announcement, noting that the submission occurred on the last day of Q1 2022, precisely when Defendants had promised it would. ¶¶145-46

## G.    The Truth is Revealed

On October 26, 2022, FDA publicly released its Briefing Document for the OCAC meeting scheduled for October 28, 2022, concluding that "difference in survival cannot be reliably attributed to omburtamab," because "[t]he external control population is not fit-for-purpose as a comparator due to substantive differences between the study and control populations," (¶155) and highlighting that FDA had repeatedly warned Y-mAbs as early as 2016 that the CGCCR data was not adequate.

11

¶156 Indeed, FDA chose to include two tables summarizing the numerous communications with Y-mAbs in which FDA's warned Y-mAbs about the inherent deficiencies in using CGCCR data as an external control. *Id.* FDA even **bolded** certain communications in which it had warned Y-mAbs of the deficiencies (*id.*) and emphasized that "Y-mAbs elected to resubmit the BLA on March 31, 2022 prior to reaching agreement with the FDA on the content of the application." ¶157

On Friday October 28, 2022, Y-mAbs announced that the ODAC had voted unanimously 16 to 0 denying approval. ¶164 During the meeting, FDA again highlighted that "*[e]arly on, we cautioned …and consistently highlighted* that the ability to interpret the data would largely depend on the comparability of the populations …[and] the receipt of so much intensive treatment prior to administration of omburtamab…*would likely make it difficult to determine if any effects on survival are due to omburtamab and not to those treatments*. ¶165

On this news, Y-mAbs's stock price plummeted 76%, from $15.17 on October 28, 2022 to $3.61 October 31, 2022. ¶¶ 162-63, 166

## III.    ARGUMENT

To state a claim under Rule 10b-5, Plaintiffs must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead a "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the

plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is appropriate only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014). The Complaint need only contain sufficient facts "to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.     Plaintiff Adequately Alleges False and Misleading Statements

A statement is actionable if it, "viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81, 83 (2d Cir. 2014). "Disclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1321 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

> The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors. Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation.

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). Moreover, "[i]t is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell **the whole truth**." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

### 1.     Defendants' Statements of Fact Are Actionable

Throughout the Class Period, Defendants made numerous false statements of fact.

- On October 6, 2020, when directly asked, "*[a]re these new issues being raised [in the RFT] that hadn't been discussed previously?*" Moller responded unequivocally *"yes, I was very surprised*." ¶96. This was blatantly false. FDA had raised the issues many times. Moller then represented that Y-mAbs had already cured the identified deficiencies: "*So very clear, and we have everything*" ¶100 This was false because, for example, FDA required the submission to include a comparison of patients that received craniospinal irradiation but zero CGCCR patients received that treatment.

- On November 6, 2020, Moller proclaimed, "*[w]e have resolved all the issues that [FDA] have requested*." ¶107. This was false because at the November 3 meeting, FDA had confirmed that the deficiencies in the CGCCR data persisted (*e.g.* "an imbalance in receipt of radiation treatment…, specifically craniospinal irradiation"). ¶106

- On February 26, 2021, Moller proclaimed as "good" news that SIOPEN included "*more granularity and details on that database … So now we have 2 sets of historical controls… which the FDA seems to be very happy about*." ¶117 This was objectively false and misleading because Y-mAbs had admitted to FDA that "that data on post-CNS relapse was not available." ¶112[1]

Defendants also repeatedly misrepresented the factual contents of their meetings with FDA:

- On June 23, 2021, November 5, 2021, and February 25, 2022 Moller stated that Y-mAbs was "*aligned with the FDA on the next steps [towards the resubmission of the Omburtamab BLA]*." ¶¶122, 127, 137 On November 5, 2021 and February 25, 2022, Gad reassured investors that the resubmission was "*progressing well*" and "*progressing as planned*." ¶¶127, 137 On February 11 and 25, 2022, Gad stated that at FDA at the January meeting had "*provid[ed] a clear regulatory path forward for the resubmission of the BLA*," (¶133) and had "*confirmed our path towards a BLA resubmission in March*." ¶137 On February 25, 2022 Moller stated, "*all the information that we need, we have*" and that auditing the CGCC data was "*not something that is holding up the submission of the BLA filing*." ¶138

These statements were false and misleading because FDA never agreed with Y-mAbs on the sufficiency of the BLA. As late as January 13, 2022, FDA expressly stated, "*there was insufficient information to provide agreement on the efficacy package to support the BLA*," certain of Y-mAbs suggested adjustments to the data were "arbitrary" and "the ability to satisfactorily audit the CGCCR external control database for the external control cohort *would be* a filing issue." ¶¶131-132 And over a year after Defendants said they had resolved all issues, FDA continued to conclude that "the CGCCR external control was not fit-for-purpose" and that "*if ultimately FDA cannot determine if the patient populations are similar enough…an alternative clinical development program will need to be discussed*" before resubmitting the BLA. ¶119. These statements were

---

[1] Moreover, such information cannot be a basis for FDA being "happy." FDA reiterated that Y-mAbs had failed to address the identified deficiencies. ¶112

also misleading because a reasonable investor would understand them to suggest that the results from the FDA meetings was positive for Y-mAbs when, in fact, they were not.

Finally, Defendants' April 1, 2022, announcement of "the completion of Y-mAbs' second BLA submission…" (¶143) was misleading because based on Defendants' prior statements that Y-mAbs would not resubmit the BLA until they "reach a final agreement with the agency" and "get a green light," investors would have understood the announcement as meaning that Y-mAbs had obtained that agreement. However, Y-mAbs submitted the BLA despite FDA concluding that "there was insufficient information to provide agreement on the efficacy package to support the BLA." ¶131 Following the revelation of the truth, analysts stated that they were misled. ¶158 (stating that their optimism was misplaced given that "YMAB resubmitted the application 'prior to reaching agreement with the FDA on the content of the application'"); ¶160 ("It also gives us pause that there was not go-ahead on the totality of the content in the resubmitted BLA").

Defendants do not challenge the falsity of Moller's affirmation that the issues raised in the RTF letter were "new issues being raised [in the RFT] that hadn't been discussed previously," (¶96) that Y-mAbs already "ha[d] everything" to address the deficiencies, (¶100) that the auditing the CGCC data was "not something that is holding up the submission of the BLA filing," (¶138) or Gad's statement that the BLA resubmission had been "complet[ed]." ¶143[2]

Defendants assert that their statements "we have resolved all the issues that [FDA] have requested," being "aligned" "progressing as planned", that FDA had "confirmed our path towards a BLA resubmission," "provid[ed] a clear regulatory path forward for the resubmission of the BLA," "all the information we need, we have," and about the SIOPEN database  are opinions that

---

[2] Defendants instead focus on whether Gad was "excited" about the announcement. Def. Br. at 14.

are actionable only if Plaintiffs can allege that Defendants did not "genuinely believe" the statements. Def. Br. at 13-14, 17. Defendants are wrong on the facts and law.

These are statements of fact. The "certainty" of these unqualified assertions characterizes them as statements of fact. *See Omnicare*, 575 U.S. at 183. They are "not framed like…statement[s] of opinion" as they are not "couch[ed] . . . with prefatory language like 'I believe' or 'In my estimation,'" *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020), that conveys the "uncertainty" that is the hallmark of opinions. *Omnicare*, 575 U.S. at 190.

Even if opinions, these statements are still actionable because Defendants "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 209-10 (citation omitted). In determining whether an opinion is misleading based on a failure to disclose facts underlying the opinion, "[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (citation omitted). As the Supreme Court explained in *Omnicare*:

> [A] reasonable investor may…understand an opinion statement to convey facts about…the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience. Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." …[I]f the issuer made the statement…**with knowledge that the Federal Government was taking the opposite view**, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

575 U.S. at 188-189. Here, a jury would have no trouble finding that Defendant's positive statements did not "fairly align[] with the information in [their] possession at the time." *Id.*[3]

---

[3] Defendants' assertion that they had no duty to disclose FDA's determinations prior to the RTF letter because companies are not required to disclose a regulatory agency's criticism unless it constitutes "a final determination" Def. Br. at 13 is off-point and their cases inapposite *See Hoey v. Insmed, Inc.*, 2018 WL 902266, at *14 (D.N.J. Feb. 15, 2018) (finding that there was no <u>affirmative</u> duty to disclose FDA comments where FDA never said the particular study design was required and never conveyed that position to the defendants prior to their false statements); *In re*

Defendants incorrectly assert that their assurances to investors that the BLA resubmission is "progressing well", "progressing as planned" and that FDA "provid[ed] a clear regulatory path forward for the resubmission of the BLA" are immaterial "puffery." Def. Br. at 16. "'[A] complaint may not properly be dismissed…on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (ellipsis in original) (citation omitted). "'[B]ecause the materiality element presents "a mixed question of law and fact," it will rarely be dispositive in a motion to dismiss[.]'" *Id.* (citations omitted).

"[W]hen the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors." *In re Vale S.A. Sec. Litig.*, 2020 U.S. Dist. LEXIS 91150, at *33 (E.D.N.Y. May 20, 2020); *see* "*In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. July 30, 2015) (statements of "general integrity and ethical soundness" were not puffery because they were "made repeatedly in an effort to reassure the investing public about the Company's integrity"); *In re BHP*

---

*Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015) (accurately disclosing results of a study does not create duty to disclose concerns raised by FDA during the process where the concerns were already publicly known and the drug later approved). Here, Defendants affirmatively misrepresented the contents of the final determination in the RTF letter as well as that the deficiencies had been repeatedly discussed with the Company. Moreover, FDA concluded that an adequate comparator *was* required and the CGCCR data was not adequate. FDA also never agreed on the contents of the BLA and suggested that Y-mAbs would need to pursue "an alternative clinical development program." Courts have found a duty to disclose in similar situations. *See Sanders v. Aveo Pharm., Inc.*, 2015 U.S. Dist. LEXIS 35116, *18-21 (D. Mass. Mar. 20, 2015) (distinguishing *Sanofi*, and finding a duty disclose where the FDA "questioned whether the NDA should be filed at all" and that the FDA "expressly warned that adverse overall survival trends could affect approvability"); *Gerneth v. Chiasma, Inc.*, 2018 U.S. Dist. LEXIS 25524, *15-16 (D. Mass. Feb. 15, 2018) (required to disclose FDA "concerns" where omission rendered statements misleading).

17

*Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (similar);  *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) ("optimistic statements" that "everything [was] going fine" with FDA approval were actionable where designed to "reassure" investors). Here, omburtamab was Y-mAbs' "lead product candidate" (¶32) and the progress of the BLA following the RTF letter was of the utmost importance to investors. Recognizing this, Defendants reassured investors following every FDA meeting, (¶¶95, 107, 114, 120, 122, 127, 133, 137, 143) analysts specifically asked about the progress and "new timeline," (¶99) and analyst reports addressed the status as well as Defendants' assurances. ¶104 For example, following Defendants' statements about being "aligned with the FDA on the next step" and having a "clearer path towards resubmission," analyst reports stated ***"[i]mportantly***, the anticipated regulatory path seems to be ***more clearly outlined***, and the company has ***aligned with the FDA*** on the next step forward.…we maintain our view that ***there is a high probability of an ultimate approval, given what appears to be*** a high level of regulatory engagement…and ***favorable view of the data the company has generated***." ¶124 *See also* ¶125 ("we are pleased to see YMAB make progress with the FDA…We anticipate a positive pre-BLA meeting outcome and an eventual FDA approval"); ¶136.  Moreover, statements are not immaterial puffery when, as here, the speaker "knew that the contrary was true." *Novak*, 216 F.3d at 315 (holding that statements that the inventory situation was "in good shape" or "under control" are actionable). Courts routinely find similar statements actionable.[4]

---

[4] *See, e.g., Todd v. STAAR Surgical Co.*, 2016 U.S. Dist. LEXIS 186511, at *25 (C.D. Cal. Apr. 12, 2016) (statements that "consolidation efforts are proceeding according to plans" not puffery); *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1187, 1193 (N.D. Cal. 2008) (statements that "all phases of the integration process are either on target or ahead of plan" were false where "Defendants knew of the problems with the integration"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877, 880-81 (D. Minn. 2007) (similar); *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1353-54 (N.D. Ga. 2018) (defendants' statements that the company was "on track" were actionable); *In re Extreme Networks Sec. Litig.*, 2018 U.S. Dist.

**2.    Defendants' Assurances That They Could Remedy Deficiencies in the CGCCR Data Are Actionable**

On October 5 and 6, 2020, Defendants also proclaimed that the RTF letter (which they refused to disclose to the market) was "not a problem" and only "a minor setback," (¶¶100-101) reassuring investors that "Y-mAbs is confident that it can address all points raised by the FDA" (¶¶93, 95) and "very clear…I have no concern that the FDA will think, 'Oh, that is not sufficient response.'" ¶100 Similarly, on November 6, 2020, February 26, 2021 and December 15, 2021, Moller repeated "Y-mAbs is confident that it can address all points raised by the FDA," (¶¶107, 115) and "we expect to get a green light …I think we have put together a very strong package that should satisfy the concerns the FDA raised." ¶129

These statements are misleading under *Omnicare* because, as discussed above, a jury would have no trouble finding that these statements, when considered in context, did not "fairly align[] with the information in [their] possession at the time." *Omnicare*, 575 U.S. at 189.[5]

**3.    Defendants' Remaining Statements Are Actionable**

Defendants incorrectly assert that their statements discussing the results of Study 03-113 and Study 101 are not actionable. Def. Br. at 17-18. Unlike the cases relied on by Defendants, here, Defendants did not merely disclose the result of Study 03-133 or provide general statements that the results are "promising." Def. Br. at 17-18. Instead, they affirmatively chose to represent

---

LEXIS 46638, at *65 (N.D. Cal. Mar. 21, 2018) (statements that integration was "on track" was misleading where the integration was experiencing problems).

[5] Defendants incorrectly assert that these statements were not misleading because FDA ultimately set an ODAC meeting. Def. Br. at 14-15. First, Defendants improperly interject numerous facts not contained in the Complaint for the truth of the matter, which the Court cannot consider at this stage. Second, Defendants ask the Court to make inferences in their favor based on these alleged facts, which is also impermissible. The inference in Plaintiff's favor, which the Court is required to make, is that FDA determined that Y-mAbs had conceded that they could not cure the deficiencies and would try for a "hail Mary." This was confirmed by the Briefing Document, the ODAC vote and analysts' reactions.

to investors that "This ***compares very favorably*** to an OS of approximately 30% in [the CGCCR] control group." ¶109 However, FDA had specifically told Y-mAbs that the CGCCR was not an adequate comparator. *See Sanders*, 2015 U.S. Dist. LEXIS 35116 at *16-19 (defendants misled investors by failing to disclose FDA's concerns about the drug's safety and approvability when discussing the overall survival and safety with investors and "describing the drug as superior" to another drug). Moreover "[w]hen reasonable investors are led to believe that regulatory approval is a 'when not if' proposition, as was arguably the case here, subjective scientific disagreement over the efficacy of the drug should be disclosed to investors." *Id.* (quotation marks omitted).[6]

Defendants incorrectly assert that their statements regarding the timing for resubmission of the BLA (Def. Br. at 15-16) and the prospects of FDA approval (Def. Br. at 18-20) are protected by the PSLRA safe harbor. First, as discussed below, the Complaint alleges that Defendants had actual knowledge that their statements were false. Second, cautionary language cannot be "meaningful" if it is "misleading in light of historical fact[s]," *Slayton v. American Express Co.*, 604 F.3d 758, 770 (2d Cir. 2010), "that were established at the time the statement was made." *Id.* at 769. For example, when Defendants stated on November 6, 2020 that they had resolved all issues and would resubmit by the end of 2020, they knew that the deficiencies could not be cured. Similarly, when they confirmed the timeline following the January 2022 meeting, and stated that they were optimistic about approval they knew that FDA had refused any agreement on the BLA

---

[6] Defendants' cases are distinguishable. *In re Alkermes Pub. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 294 (E.D.N.Y. 2021) (complaint devoid of "any information conveyed to Alkermes that should reasonably have been interpreted to suggest that FDA approval of ALKS 5461 was not possible or even unlikely" and FDA "voiced no objection to the use of SPCD as a proof-of-concept study."); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 584-585 (S.D.N.Y. 2016) (stating that there is "no ***affirmative*** duty to disclose the substance of interim feedback received from the FDA" where "the SAC does not allege that any issue raised in the [non-approval letter"] was unresolved by the time Study 008 was completed").

and found the CGCCR data inadequate. *See Credit Suisse First Bos. Corp. v. Arm Fin. Grp*., 2001 U.S. Dist. LEXIS 3332, at *23 (S.D.N.Y. Mar. 27, 2001) ("warnings of specific risks…do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *Gerneth*, 2018 U.S. Dist. LEXIS 25524 at *15-16 ("While 'ultimate FDA disapproval…could not have been known at the time of the…omissions, certainly the FDA had expressed concerns' that made Chiasma's claim that it would be able to secure approval for Mycapssa with shorter development timelines materially misleading when it was made, because the omitted fact made approval on any timeline less likely").

### B.      Plaintiff Has Alleged a Strong Inference of Scienter

"[S]cienter can be established by alleging facts to show…strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 198 (2d Cir. 2009). Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc. Sec. Litig*., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). A strong inference of scienter exists where a complaint alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA*, 553 F.3d at 199. Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* At 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* At 331.

21

A classic fact pattern giving rise to a strong inference of scienter is "where defendants . . . knew facts or had access to information suggesting that their public statements were not accurate…" *Employees' Ret. Sys.*, 794 F.3d at 306 (quotation marks omitted). Plaintiff alleges, and Defendants do not dispute, that they were aware of FDA's concerns in the RTF and meetings. This alone is sufficient to allege scienter.

Scienter is further strengthened for each Defendant because they spoke in detail about the RTF letter, their meetings with FDA and the SIOPEN data. If executives speak about a topic of "critical importance", they cannot hide their heads in the sand and ignore crucial information at their fingertips about it. *City of Livonia Employees Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010); *see In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) ("Defendants cannot maintain that its officers repeatedly disclosed the RMBS content of the CDOs-squared to the market, but that none of its officers were aware of the RMBS backing the CDOs-squared). Scienter "is further strengthened when circumstances indicate that public statements were made to placate the market in response to inquiries about [the relevant issue]." *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at *9 (W.D.N.Y. Jan. 6, 2023) (collecting cases). Defendants' statements were all issued in response to the RTF letter and analysts' concerns about the BLA resubmission. Defendants provided assurances following every FDA meeting and even submitted the BLA without FDA agreement to meet their guidance, which analysts noted "should provide some relief for investors." ¶¶145-46

Scienter is further supported by the fact that omburtamab, as the Company's "lead product candidate," and was critical to the value of the Company. *See In re Atlas Air Worldwide Holdings,*

22

*Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). "Core operations" include matters "critical to the long-term viability" of the company and events affecting a "significant source of income." *In re Avon Sec. Litig.*, 2019 U.S. Dist. LEXIS 200816, at *61 (S.D.N.Y. Nov. 18, 2019) quoting *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Defendants' assertions that omburtamab was not important to the Company is belied by the analyst coverage and the fact that the value of Y-mAbs plummeted 76% when FDA denied approval. ¶¶162-66

Defendants argue that scienter is not adequately alleged because Plaintiff has not alleged a motive. Def. Br. at 21-22. The Second Circuit has reversed district court decisions based on such "erroneous" analysis: "To satisfy the scienter requirement, a plaintiff need not allege facts which show the defendants had a motive for committing fraud, so long as the plaintiff…adequately identifies circumstances indicating conscious behavior by the defendants." *Cosmas*, 886 F.2d at 13. In any event, Defendants' motive for not disclosing the dire prospects of the BLA is obvious. They were delaying the inevitable, hoping against hope that their failure would not materialize. Moreover, when Y-mAbs received the RTF letter, the Company was in the process of conducting a secondary offering, which it completed on February 17, 2021, selling 2.8 million shares at $41.00 per share, for gross proceeds of $115 million. ¶171 If these shares were offered following the revelation of the truth at the market price of $3.61, Y-mAbs would have raised a meager $10 million. *See Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) (holding that misstatements that artificially inflate a stock price in advance of a public offering support motive and an inference of scienter); *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 206 (E.D.N.Y. 2000) (same); *Duncan v. Pencer*, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (same). This motive is further strengthened by the allegations that from 2019 through the first quarter of 2022, Gad realized gross proceeds of $ $43.0 million from sales of Y-mAbs common stock, including

$7.0 million in the first quarter of 2022 alone, just as Y-mAbs was submitting the BLA despite not obtaining agreement with FDA. ¶172

The inference of scienter is at least as strong as the asserted non-culpable inference.

### C.    Plaintiff Adequately Alleges Loss Causation

Loss causation is adequately pled where a plaintiff alleges either "(a)…that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters*, 750 F.3d at 233 (2d Cir. 2014) (quotation marks removed). These "are not wholly distinct theories of loss causation." *In re Vivendi,* 838 F.3d at 261. The Complaint alleges that Defendants' fraudulent statements concealed the true risk associated with the omburtamab BLA and the risk materialized when FDA released the Briefing Document – with the charts highlighting the numerous times FDA warned Y-mAbs of the deficiencies – and the ODAC denied approval. ¶¶154-66 Moreover, the FDA Briefing Document and ODAC meeting also revealed the falsity of Defendants' statements concerning, *inter alia*, (i) Moller's assurance that the RTF letter contained "new issues" never previously raised by FDA, (ii) Defendants' assurances that they had resolved all of the deficiencies identified by FDA, (iii) Moller's assertion that the SIOPEN database had relevant details that resolved the deficiencies, (iv) Defendants' assurances that FDA was "aligned" and in agreement with Y-mAbs and the process was going "well" and "according to plan," and (v) the filing of the BLA, which suggested that FDA was in agreement as to the submission package. As a result of the corrective events, Y-mAbs stock price plummeted 76%. ¶¶162-63, 166 Notably, following the disclosures, several analysts lamented that they had been led to believe that approval was a certainty based on Defendants' prior statements and were shocked that Y-mAbs had submitted the BLA without agreement with FDA. ¶¶158-61 Cases finding loss causation adequately alleged under similar circumstances are legion. *E.g., In re GPC Biotech AG Sec. Litig.*,

24

597 F. Supp. 2d 412, 425 (S.D.N.Y. 2009) (stock price declines following disclosure of FDA Briefing Document and subsequent ODAC vote sufficient to allege loss causation); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014) (similar).

    **D.**    **Plaintiff Adequately Alleges Section 20(a) Claims**

Because the Complaint adequately alleges a violation of Section 10(b) as to Moller and Gad, including scienter, the Complaint also adequately alleges a violation of Section 20(a).

**IV.**    **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss. In the alternative, Plaintiffs respectfully request leave to amend in the event that the Court finds that the Complaint falls short of any applicable pleading standards. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).

Dated:  August 29, 2023               Respectfully submitted,

                                     **POMERANTZ LLP**

                                     */s/ Michael J. Wernke*
                                     Jeremy A. Lieberman
                                     Michael J. Wernke
                                     600 Third Avenue, 20th Floor
                                     New York, New York 10016
                                     Telephone: (212) 661-1100
                                     Email:  jalieberman@pomlaw.com
                                              mjwernke@pomlaw.com

                                     **POMERANTZ LLP**
                                   Patrick V. Dahlstrom
                                   10 South La Salle Street, Suite 3505
                                   Chicago, Illinois 60603
                                   Telephone: (312) 377-1181
                                   Email:  pdahlstrom@pomlaw.com

                                   *Lead Counsel for Plaintiff*